# Richmond

## Louise M. Gray and Thomas J. Gray v. C. O. McCormick, Substituted Trustee, etc.

January 18, 1943.

Record No. 2603.

Present, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*W. G. Vansant* and *Carrington Thompson*, for the appellants.

*Langhorne Jones* and *Crews & Clement*, for the appellee.

GREGORY, J., delivered the opinion of the court.

C. O. McCormick, Substituted Trustee in Bankruptcy for Thomas J. Gray, instituted a suit against Gray and his wife attacking two transactions had between them on the grounds,—first, that Gray while insolvent had used his funds to construct a $5,000 home on a lot that belonged to Mrs. Gray; and, second, that he had while insolvent and without consideration transferred to her his policies of life

insurance which had a cash surrender value of more than $4,000.

Mrs. Gray defended on the grounds that she paid from her own funds the entire cost of the home, and that she actually gave her husband $4,200 of her own money for the policies of insurance.

The court below held that both transactions were fraudulent and impressed the house with a lien in favor of the trustee of $5,000. The assignment of the policies was annulled.

■ This is another case of alleged fraud, involving transactions between a husband and wife. It must be decided upon the particular facts as disclosed by the record in this case. The rule of law to be applied is elementary. If Gray were insolvent and used his funds to build a house on a lot belonging to his wife, and if, while insolvent, he assigned his insurance policies to his wife without consideration and both transactions were made with intent to hinder, delay and defraud his creditors, the decree of the lower court is correct.

■ The house was built in 1935 and the early part of 1936. The policies were transferred to Mrs. Gray in June, 1938. If Mrs. Gray actually paid for the entire cost of the house and if she actually paid her husband $4,200 for the insurance policies and if she did not know of any fraudulent intent on his part, the transactions should stand.

The cause was not referred to a commissioner in chancery. All of the testimony was taken before a notary public and it was submitted to the court for determination upon depositions and exhibits.

Mr. and Mrs. Gray moved to Chatham in 1915. They formerly lived in Gloucester county. When they came to Chatham he became associated with the Crowell Auto Company, a concern which had the Ford agency in Chatham as well as the same agency in several other communities in Virginia and North Carolina. Mr. Gray was paid a salary of $350 per month most of the time. He purchased stock

in the Crowell Auto Company with his savings and also purchased considerable life insurance.

In 1922, Mr. Gray purchased an unimproved lot in Chatham and in 1928, after the lot was completely paid for, he conveyed it to his wife in consideration of love and affection and $5.00 in cash. At that time Mr. Gray was not in debt. The deed was promptly recorded.

In 1930, Mr. Gray purchased the Chatham branch of the Crowell Auto Company and incorporated the concern in the name of the Chatham Motor Company, Inc. He had already purchased $10,000 of stock in the old company and used it as a part of the purchase price. He assumed an obligation of the old company due the Chatham Savings Bank for about $5,000. The new company was incorporated for $10,200, Mr. Gray owning $10,000 of the capital stock and his wife and brother each owning a $100 share. The corporation borrowed $6,000 from Mrs. Gray and $3,000 from Mr. Gray's brother, L. R. Gray. Notes were given by the Corporation for these loans and they were indorsed by Mr. Gray. The $9,000 derived from the two loans was used for the purposes of the corporation.

Business conditions for this company were not good from 1930 to 1933. The Chatham Savings Bank closed its doors on December 1, 1930, and at that time the corporation owed that bank some $5,900 and Mrs. Gray had had certificates of deposit in the bank aggregating $2,500 which she had endorsed to her husband, T. J. Gray. In the liquidation of the bank, Mr. Gray testified that 90% of the total of the certificates represented his funds and he was allowed to offset the certificates against his indebtedness due the bank. Mr. Gray stated that the certificates originally had been purchased by Mrs. Gray with her own money and after he had used them to offset the debt due the bank, he felt that he should repay her and therefore in 1934 he accepted the surrender value of certain policies of insurance and used the proceeds to repay Mrs. Gray for the certificates and 3 years' interest.

For the last portion of 1933 and the whole of 1934, 1935, 1936 and 1937, the Chatham Motor Company enjoyed prosperous business. Statements purporting to show the financial condition of the company were introduced. These were inaccurate, incomplete and insufficient to disclose the true financial status of the company for those years. In 1935, however, it was established that the company sold 150 new cars and more than 200 second-hand cars. The company won for that year the contest for the best sales in the district and a trip for Mr. Gray to California at the expense of the Ford Motor Company.

In August, 1935, the construction of a dwelling house was begun on the lot of Mrs. Gray which had been conveyed to her by her husband in 1928. She testified at great length that she furnished the entire sum of money that was necessary to pay the cost of the dwelling; that it cost $5,000 and that she provided the money in cash, turned it over to her husband, T. J. Gray, from time to time and he, in turn, deposited it in bank in his name. He signed the checks which were used to pay for the labor and materials. Gray corroborated his wife's testimony and Mr. Norman, the bookkeeper for the Chatham Motor Company, also testified that none of the money of the company was used to construct the dwelling.

Mrs. Gray stated that she was quite deaf and did not feel equal to handling this business and for that reason left it to her husband.

The first deposit in the bank account was $1,680 in cash. On the duplicate deposit slip is this notation: "Cash money received from Mrs. T. J. Gray for labor payroll for new home," and the next duplicate deposit slip of September 18th for $200 bore this notation: "Money received from Mrs. T. J. Gray for new house". Thereafter other deposits were made in the account that exceeded the $5,000 cost of the dwelling by some $4,000. The house was completed early in 1936 and the Grays have lived there since. Later in 1936, the bank account was changed to the name of Mrs. Gray.

Mrs. Gray was a salaried worker for the Chatham Motor Company from the beginning of the company in 1930 until it was closed out in 1939. Her salary was $50 per month and she testified that she saved an amount in excess of $4,200.

In 1937, the business of the Chatham Motor Company increased and 180 new cars and 250 used cars were sold that year. The total business of the corporation that year was more than $200,000. Following this achievement a recession set in and business began to lag. A great number of cars were repossessed and had to be reconditioned entailing considerable added cost. In 1938, Mr. Gray needed additional funds for his business and the bank would not lend him or his company these funds unless Mrs. Gray indorsed the note. This she refused to do. At this time the life insurance policies on the life of Mr. Gray had a cash surrender value in excess of $4,000 and he and Mrs. Gray testified that they agreed that she would buy the policies and pay him $4,200 for them if he would have them properly assigned to her. This was finally accomplished in June, 1938, and, in accordance with the testimony of both of them, $4,200 in cash was paid by Mrs. Gray to Mr. Gray and she received the policies in exchange for the money.

The fact that Mrs. Gray actually paid over the $4,200 is evidenced by a receipt signed by Gray. This receipt was written by Mr. Norman, the bookkeeper, at the direction of Mr. Gray and Mr. Norman says that he saw Mrs. Gray give Mr. Gray an envelope that had money in it, but he did not know the amount but assumed it to have been $4,200, the amount set out in the receipt he had written. He also saw Mr. Gray pay from these funds the price of a load of automobiles which was delivered to the company at that time and which usually ran around $2,000 to $2,200.

In 1938, business was not good with the corporation and in 1939 this condition continued. The Ford Motor Company called upon Mr. Gray to put more money in the corporation and he attempted to comply with the request and to that end had a meeting with the interested representatives

of the banks with whom he did business. The result of this meeting was not favorable but during the meeting there was testimony that Mr. Gray admitted his insolvency relating back to 1930, the beginning of the business. This testimony was contradicted by Mr. Gray.

Soon after the meeting the Ford Motor Company cancelled its contract with the Chatham Motor Company and still later the Chatham Motor Company made an assignment to the Planters Bank & Trust Co., Trustee. The trustee has liquidated the assets of the corporation and distributed the proceeds. Mrs. Gray was one of the creditors to the extent of $5,000.

On September 26, 1939, Mr. Gray filed his petition in bankruptcy and was duly adjudicated a bankrupt. His liabilities were $32,000, representing largely his indorsement for the company. His assets were $300.

The trustee filed the present suit in April, 1940, the purpose of which, as already stated, is to establish that Gray built the dwelling with his own money or with funds withdrawn from his corporation, and transferred his insurance both with intent to hinder, delay and defraud his creditors.

The depositions are voluminous. Mr. and Mrs. Gray were called as adverse witnesses and both of them testified at length. Their evidence discloses that Mrs. Gray had considerable estate which was in money and which she did not keep in bank but kept it at home, in a lock box at the bank and in a lock box at the Chatham Motor Company to which latter box Mr. Gray had access. She, no doubt, had enough estate to pay the $5,000 for the house and the $4,200 for the policies. She had a substantial estate prior to 1930 and subsequent to that time it was increased by her salary, the interest she received, rent of an apartment and of a room.

Mr. Duncan of the bank testified that several items of deposit to the building account of Mr. Gray were identical in amount and time with similar amounts withdrawn from the account of the Chatham Motor Company. For instance, on October 9th, $600 was withdrawn from Chatham Motor Company and on October 10th, a $600 deposit was made to

Gray's building account. Several other like transactions took place and no satisfactory explanation has been made by either Mr. or Mrs. Gray of this rather obvious shifting of funds from the corporation to Mr. Gray's bank account. This shifting of funds is bound to have been known to the bank because its book entries disclosed it.

The lower court evidently concluded that the corporation and Gray were insolvent in 1935 and in 1938 when the questioned transactions occurred, and that the shifting of funds from the bank account of the Motor Company to Gray's building account was fraudulent and that the entire cost of the dwelling amounting to $5,000 was provided by him and not by his wife. Further, the court evidently did not believe that Mrs. Gray actually paid the $4,200 for the policies.

When transactions between an insolvent husband and his wife are challenged, the burden is upon the wife to show that they were made in good faith and not in fraud of creditors. On the other hand, dealings between husband and wife are valid and binding if the husband is solvent at the time, or if insolvent and he possesses no fraudulent intent, they are still valid when the dealings do not diminish his estate.

Gray was not indebted in 1928 when he conveyed the lot to his wife. No presumption of fraud arises from that conveyance and the burden is upon the subsequent creditor to show that a prospective fraud was contemplated and directed against him. This has not been done. There is no proof that this conveyance was made in anticipation of future indebtedness and in fraud of creditors. *Richardson* v. *Pierce*, 105 Va. 628, 54 S. E. 480. Therefore, there can be no question of fraud in the procurement of the lot. The lot unquestionably belonged to Mrs. 'Gray.

As already stated she possessed sufficient estate to build the house and to buy the insurance policies. In addition she had enough to permit her to make an actual loan of $6,000 in 1930 to the corporation. This loan was made in good faith.

From the evidence it is obvious that Gray treated the assets of the corporation as his own. His personal affairs and those of the corporation are not readily severable. When assets of the corporation were diminished, his personal assets likewise were diminished. The solvency of each was mutually dependent upon the other. If the corporation was insolvent in 1935-36 or 1938, then Mr. Gray was insolvent at those periods.

We must remember that the building transaction took place more than four and one-half years before the suit was brought. Since then the corporation has been liquidated by a trustee and its assets sold and the proceeds distributed. T. J. Gray has been adjudicated a bankrupt, the Ford agency, which his corporation had, has been cancelled. The evidence must be considered in the light of those facts.

The first two deposits in Gray's building account were evidently made from money belonging to Mrs. Gray. They aggregate $1,880. There is not any evidence that this money belonged to Mr. Gray or the corporation except the possible inference that might be drawn from the fact that it was deposited in an account in the bank which then stood in his name. On the other hand, the other deposits made to the account aggregating $3,120—the difference between the $1,880 and the total cost of $5,000—appear to have been shifted from the corporation to Gray's building account, or from Gray's personal assets, and to that extent, at least, diminished the assets of the corporation and of Mr. Gray.

Ordinarily we are prone to be a little dubious when one says that he keeps large sums of money at home, or in a lock box, but we know after the banking holiday in 1933 with the failure of many banks to reopen, a great number of people were afraid to trust the banks with their money and they placed it in safety deposit boxes or kept it at home or hidden elsewhere in preference to depositing it in banks. We must consider the fact that Mrs. Gray had had $2,500 in certificates in a bank which had already failed. She could reasonably have doubts about the safety of banks

from her own personal experience, to say nothing about the wide unfavorable comment that had been circulated about banks.

A debtor is bound to devote the whole of his property to the satisfaction of the demands of his creditors. If he does not retain sufficient of his property to pay his debts and conveys or transfers it to a gratuitous grantee or transferee it may be followed into the latter's hands and subjected to the demands of the creditors of the grantor or transferor. An insolvent debtor cannot surrender, without adequate consideration, rights available to his creditor. *Hauser* v. *King*, 76 Va. 731. However, insolvency alone does not deprive the owner of the right to dispose of his property. It must be coupled with an intent to hinder, delay and defraud creditors. *Shoemaker* v. *Chapman Drug Co.*, 112 Va. 612, 72 S. E. 121; *Ferguson* v. *Daughtrey*, 94 Va. 308, 26 S. E. 822.

When an insolvent debtor places improvement upon another's land in fraud of creditors the latter may be charged with their value. *National Valley Bank* v. *Hancock*, 100 Va. 101, 40 S. E. 611, 93 Am. St. Rep. 933, 57 L. R. A. 728; *New South Bldg., etc., Ass'n* v. *Reed*, 96 Va. 345, 31 S. E. 514, 70 Am. St. Rep. 858.

In order to render a transfer void as to creditors the fraudulent intent must be concurred in by both the transferor and the transferee. It is not void if founded on adequate consideration and the transferee had no knowledge of the fraudulent intent of the transferor. *Hutcheson* v. *Savings Bank*, 129 Va. 281, 105 S. E. 677.

Dealings between husband and wife demand close scrutiny. Presumptions are in favor of creditors and where the husband's property ends in the possession of the wife, the burden is upon her to show clearly that she obtained it in good faith. She must fairly satisfy the mind of the chancellor. (See Digest of Virginia and West Virginia Reports, Vol. 5, p. 176.) Here we have no conveyance but only an allegation that the husband has spent his money improving his wife's property to the prejudice of creditors.

██ We have scrutinized these questioned transactions closely in the light of the evidence, and our conclusion is that they were not consummated with an intent to hinder, delay or defraud Gray's creditors. The charge of insolvency against him in 1935 and 1936 is not established. The only evidence offered to show insolvency was the financial statements of the Chatham Motor Company and the disputed testimony of the bankers who said that Gray admitted in their presence in 1939 that he had been broke since 1930 when he started in business.

The financial statements have been examined with great care and from them it cannot be fairly concluded that Gray was insolvent in 1935 and 1936. Some of them were made for the Ford Motor Company and did not purport to show the true condition of Gray or the company. Others were obviously inaccurate and items both of assets and liabilities were omitted. If they had been included the statements still would not have shown insolvency. No audit was made of the books of the company and the books were not introduced in evidence.

On the other hand, the company sold 150 new cars and 200 second-hand cars in 1935. It remained a going concern for more than four years afterward. It could and did, during that period, obtain credit at banking institutions. Banks may sometimes make loans to insolvent concerns but when they do it is an exception. Generally, they are satisfied of the solvency of a borrower before a loan is made. Gray did not have any difficulty getting loans for his company until 1938, and in 1939 when the Ford Motor Company was about to cancel his agency contract.

The alleged admission of Gray that he had been "broke" since 1930 when he opened his business may or may not have been made. If made, there was no evidence that it was communicated to Mrs. Gray. His declaration of insolvency could not bind her when she did not know of it. *Neff* v. *Edwards*, 148 Va. 616, 139 S. E. 291.

It is inconceivable that he could have held a Ford agency for nine years and could have deceived the banks for so

long a time if he had been insolvent. It would have been difficult for him to have concealed his insolvency from such a capable and efficient class of men as those who generally have the affairs of the Ford Motor Company and the banks in hand. Chatham is a small town and officers of a local bank would likely know when one of its local business men is in financial trouble, especially when the business man is a customer of the bank.

Therefore, if Gray in 1935 actually paid a part of the cost of the dwelling from his own funds, or those of his company, the evidence does not show that he thereby intended to defraud his creditors. He has not been shown to have been insolvent in 1935 or 1936. In fact, the most reasonable inference to be drawn from all of the evidence is that he was not actually insolvent until 1939 when he unsuccessfully sought additional funds from the banks for his business and lost the Ford agency. Even then one of the representatives of the bank most interested here stated that he did not think the business should have been closed, but that with reasonable help, which he favored, the business could have continued to the advantage of all. This representative said: "I did not think then, and I do not think now, that there was any real reason why he should have gone out of business. I have known people in worse shape than he was to stay in business and pay out and go on and my attitude was to keep him in business, to save himself and to save us".

In 1938, when Gray transferred the insurance policies to his wife, he was not insolvent. The evidence fails to show that his assets were less than his liabilities at that time or that he could not and did not satisfy the demands of his creditors. There is no evidence that any of them had pressed him by law actions or otherwise. The cash surrender value of the policies was a personal asset of Gray, and when he assigned the policies for cash to his wife, the cash took the place of the value of the policies and it was turned into the business thereby making the business stronger to the extent of $4,200. It placed the business in a better

position as a going concern from which Gray would obtain a continuance of his salary. Therefore, nothing was taken or diverted from the creditors by this transaction. They were not prejudiced.

Our conclusion is that neither Gray nor the Chatham Motor Company was shown to be insolvent until 1939; that in 1935 Mrs. Gray placed $1,880 in the building bank account and that Gray withdrew from the funds of the company, or his own private funds, at least $3,120 and placed it in the same account; that it has not been shown that the diversion of the $3,120 was made with the intent to hinder, delay and defraud Gray's creditors; that the policies of insurance were assigned for a present adequate consideration; and that Mrs. Gray has shown that neither transaction was in fraud of creditors. For these reasons the decree is reversed and the bill of complaint dismissed.

*Reversed and dismissed.*

SPRATLEY, J., dissenting.

I feel constrained to dissent from the majority opinion, not on account of the principles of law involved, but upon the application of those principles to the full evidence as I read it.

I am satisfied from the evidence, the surrounding circumstances, and the setting and background of the case, as set out in the record, that the appellants undertook to remove the property of Thomas J. Gray from the reach of his creditors with intent to hinder, delay and defraud those creditors. The halting, cloudy and uncertain testimony of the appellants, their admission of irregularities in their transactions, their unsatisfactory explanation of the loose manner of keeping their alleged mutual accounts, and the improbability of the reasons assigned for the transfer and ownership of the involved property to Mrs. Gray, all cumulatively tend to show that they did not act in good faith. In at least eleven specific, important instances, shown by the record and

pointed out in the brief of the appellees, there are indicia of fraud which show a concerted scheme to defraud those creditors. In one instance, where the claim of Mrs. Gray is to a sum involving $2,500, a claim now supported by Gray, Gray admits that he formerly falsely claimed the sum and was allowed it as a credit to bolster and improve his estate and financial standing. Experience teaches us that both husband and wife, under the circumstances revealed in this case, were cognizant of the financial condition of the husband, and of his purpose to arrange his estate so that, in the event of his bankruptcy or pressure from his creditors, his assets could be claimed as the property of the wife.

The learned trial judge, a chancellor of long experience, who was in a better position to know the setting and background of the case as well as the parties, came to this conclusion. His conclusion is entitled to weight, although the evidence was taken by depositions. The presumption is that he was correct, and there is ample evidence to sustain him. The appellants have not carried the burden of proof in showing that he was in error. It appears to me to be another case where a husband has gone into voluntary bankruptcy and the wife has turned out to be the owner of all his assets, assets formerly had and used in the business of the husband and held out by him to his creditors as a portion of his own estate.

HUDGINS, J., concurs in this dissent.