JUDITH E. HUDSON, INDIVIDUALLY AND AS
EXECUTOR OF THE ESTATE OF
FORREST GATEWOOD HUDSON, DECEASED

V.

CAROLE A. HUDSON

Record No. 940601

March 3, 1995

Present: All the Justices

*A. James Kauffman (G. Wythe Michael, Jr.; Taylor, Hazen & Kauffman*, on briefs), for appellant.
*Eppa Hunton (Smart & Hunton*, on brief), for appellee.

JUSTICE KEENAN delivered the opinion of the Court.

In this appeal, we consider whether there is sufficient evidence to support the trial court's ruling that a certain deed of gift was a voluntary conveyance, void as to the grantor's former wife, because she was a creditor of the grantor at the time the transfer occurred and the grantor was rendered insolvent by the transfer. Code § 55-81.

Carole A. Hudson was divorced from the grantor, Forrest Gatewood Hudson, in 1988. A property settlement agreement, incorporated into the final divorce decree, required Forrest to pay

Carole $1,200 per month in spousal support. The agreement further provided that this obligation would terminate upon Carole's death or remarriage, but that, if support were still payable at the time of Forrest's death, Carole would be paid $75,000 from the proceeds of Forrest's estate.

Forrest married Judith E. Hudson in 1990. At that time, he was the sole owner of the real property that is the subject of the claimed voluntary conveyance. He was also the president and sole shareholder of Select Construction, Inc. (Select).

Forrest executed a deed of gift, recorded on August 4, 1992, transferring the subject real property to himself and Judith as tenants by the entireties. He died on August 14, 1992. Thereafter, Carole made a demand on his estate for payment of $75,000 pursuant to the property settlement agreement. Judith, who was executor of Forrest's estate, paid Carole $9,600, leaving $65,400 unpaid.

Carole filed a bill of complaint against Judith, individually and as executor of Forrest's estate, asking the trial court to rule that the deed of gift was a voluntary conveyance, void as to Carole, because she was an existing creditor at the time of the transfer and Forrest was rendered insolvent by the conveyance. Carole further alleged that the transfer was made in an effort to defeat her claim under the property settlement agreement.

At trial, Carole testified that she had continued to receive support payments until Forrest's death, so that she was entitled to the payment of $75,000 from his estate. She did not attempt to prove that the conveyance was made with the intent to defraud her. Instead, she contended that Forrest was insolvent or rendered insolvent when he conveyed to Judith a survivorship interest in his separately held real estate. Carole introduced the inventory of Forrest's estate and stated that she was not aware of any property Forrest owned that was not shown on the inventory.

In the inventory, filed pursuant to Code § 26-12 and signed on May 18, 1993, Judith listed personal property valued at $3,500 as an asset of Forrest's estate. The only other asset listed was Forrest's stock in Select, which Judith valued at $0.

Judith testified that she was Select's corporate secretary and treasurer. She acted as office manager and "did all the bookkeeping and assisted Forrest." Judith testified that Select's construction business consisted of "mostly [federal] government and [s]tate work." She stated that these federal and state contracts

required Select to obtain performance bonds, and that Forrest personally guaranteed all obligations undertaken by a private bonding company pursuant to these contracts.

Judith stated that Select was solvent the day before Forrest died. However, shortly after his death, the bonding company cut off all future bonding commitments and did not agree to consider writing bonds for new projects until the middle of October 1992. Because of this delay, Select was unable to complete certain bid applications that were due on September 30, 1992.

Judith introduced into evidence a copy of the probate tax return that she had filed at the time she submitted Forrest's will to probate on September 2, 1992, pursuant to Code § 58.1-1714. In the probate tax return, she had valued Forrest's personal property at $250,000.

When asked to explain why she had valued this property at $250,000 on the probate tax return, although she later gave the value of the Select stock as $0 on the inventory, Judith replied:

> Well, when I valued the company at $250,000, that was based on the June 30th, 1992 tax return. And I knew the insurance money would be coming in. I knew of the liabilities that there were. So I thought I was okay.

> Then when the bonding company cut me off and so many months had passed, four months had passed, we did not have any work, new work that—on the books. Money was steadily going out. . . . I had people coming out of the woodwork basically asking for money for various things that they thought that they were owed. And so by the time the four months had rolled around, I knew at that point in time that there would be basically nothing left in the company.

Judith also testified that, shortly after Forrest's death, his tangible personal property was appraised at approximately $11,000. The value of this property is not in dispute.

Outstanding at Forrest's death were personal debts of about $3,000, as well as medical bills and current mortgage and utility bills in unspecified amounts. Judith stated that Forrest paid all his bills as they matured, and that he was not in arrears in payment of any bills on the date of his death.

Judith also presented the testimony of an expert witness, Louis Charles Einwick, Jr., chief of the valuation section of Crestar

Bank's merger and acquisition department. He testified that he is engaged solely in determining the value of private businesses.

Einwick stated that he was asked to value Select for estate tax purposes. He testified that he valued the company on an adjusted asset basis, in which he calculated the fair market value of the company's assets and then subtracted the liabilities from that amount. Among other data, he reviewed Select's financial statements, including the fiscal-year-end statement for June 30, 1992, shortly before Forrest's death, which showed a net worth of $236,000.

Einwick stated that he consulted with Judith regarding the projected losses for the last six months of 1992, and that he calculated the value of the company's fixed assets at 50% of their stated value. After considering all these factors, Einwick concluded that Select had an "adjusted equity value" of $239,000 as of December 1992. He stated that this amount constituted "our best estimate of what would be acceptable to the IRS and everybody."

In addition, Paul Wring, a certified public accountant, testified that he had prepared annual and semi-annual financial statements for Select for a number of years. He prepared Select's corporate income tax return for its fiscal year ending June 30, 1992, and its semi-annual financial statements for the periods ending June 30, 1992, and December 31, 1992. Although the tax return and the financial statements were prepared using different accounting methods, Wring testified that, under either method, Select was a solvent corporation on December 31, 1992.

After receiving this evidence, the trial court ruled that the transfer was void as to Carole, and that Judith was indebted to Carole in the amount of $65,400. In its final order, the trial court stated: "During [Forrest's] lifetime, Select Construction Co., had some value. Upon his death, the business had no value. Upon the execution and delivery of the Deed of Gift of the residence, Forrest G. Hudson was rendered insolvent pursuant to [Code] § 55-81."

On appeal, Judith argues that there is insufficient evidence to support the trial court's finding that the real estate transfer rendered Forrest insolvent. In support of her assertion, Judith points to the trial court's factual finding that Select had "some value" during Forrest's lifetime. Further, Judith contends that Carole

presented no evidence of insolvency as of the date of transfer, but only evidence of insolvency after Forrest's death.

In response, Carole notes that Code § 26-12 requires an executor to file an inventory listing the assets owned by decedent at the date of death and fixing the value of those assets as of that date. Thus, she argues that the inventory constitutes evidence that, within ten days of the transfer, Forrest's tangible and intangible assets totalled only $3,500. Carole also points to Judith's own testimony that "Forrest was the asset of the company. . . . [A]s long as Forrest was there, the company could survive . . . . [T]he company could not survive without Forrest." Carole argues that this is further evidence that supports the trial court's ruling.

In resolving this issue, we first emphasize that, in accordance with Code § 8.01-680, the trial court's decision will be upheld unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. *Bowers v. Westvaco Corp.*, 244 Va. 139, 150, 419 S.E.2d 661, 668 (1992). Since the trial court has heard the evidence ore tenus, its findings based on an evaluation of the testimony are entitled to the same weight as those of a jury. *Id.*; *Quantum Dev. Co. v. Luckett*, 242 Va. 159, 161, 409 S.E.2d 121, 122 (1991).

Under Code § 55-81, a voluntary conveyance is void as to a prior creditor upon proof that: (1) the transfer was not made upon consideration deemed valuable in law or the transfer was made upon consideration of marriage; (2) the transfer was made by an insolvent transferor, or by a transferor who was rendered insolvent by the transfer; and (3) the transferor's debt to the creditor was contracted before the time of the transfer. Since, in the present case, it is undisputed that the transfer by gift was not made upon consideration deemed valuable at law, we examine whether the evidence is sufficient to show that Forrest Hudson was insolvent at the time of the transfer or was rendered insolvent by the transfer. In reviewing this factual finding, we will assume, without deciding, that he was indebted to Carole Hudson in the amount of $75,000 at the time of the transfer.

A debtor is insolvent, within the meaning of Code § 55-81, when he has insufficient property to pay all his debts. *See McArthur v. Chase*, 54 Va. (13 Gratt.) 683, 694 (1857). In order to prove insolvency, both the value of the debtor's assets and the amount of his liabilities must be established. *See Darden v. George G. Lee Co.*, 204 Va. 108, 109-11, 129 S.E.2d 897, 898-99

(1963); *Gray v. McCormick*, 181 Va. 52, 63-64, 23 S.E.2d 803, 808-09 (1943). Thus, Carole was required to establish that the amount of Forrest's liabilities at the date of the transfer exceeded the amount of his assets, exclusive of the transferred real estate, on the same date.

The only evidence in the record suggesting that Forrest was insolvent after the transfer was the estate inventory indicating that Select was worthless and that his total assets were $3,500 at the date of his death. However, Judith also testified that she had placed the date-of-death value of the Select stock at $250,000 when she filed the probate tax return in September, 1992.

■ Although Code § 26-12 requires that the estate inventory, like the probate tax return, must reflect the value of the estate's assets at the time of death, the evidence is undisputed that Judith did not state the date-of-death value of Select in preparing the inventory. Instead, Judith's testimony shows that the May 1993 inventory reflected her perception of Select's value based on events that transpired during the months following Forrest's death. Thus, the inventory is not credible evidence of the value of Select on or about the date of the transfer, but is relevant only to the value of Select at a date several months after Forrest's death.

■ No other evidence establishes that Forrest was rendered insolvent by the transfer. As stated above, the valuation evidence presented by Einwick showed that, as of December 1992, Select had a value of $239,000. Also, as previously stated, the June 30, 1992 financial statement prepared by Wring shows that Select had a net worth of $236,000, and Wring testified that, as of December 1992, Select remained solvent.

Carole argues, however, that, notwithstanding any value that the Select stock may have had, the amount of Forrest's personal liabilities exceeded the value of that stock. Carole notes that Judith testified Forrest had personally guaranteed all obligations of the bonding company on the government contracts, and that these contracts constituted most of Select's work. She argues that these guarantees represent contingent liabilities that must be weighed in determining Forrest's insolvency. Carole suggests that the amount of these liabilities may be established by reference to Wring's figures regarding Select's income. For the year ending June 30, 1992, Wring's statement shows that Select's net sales totalled $2,858,000.

■ We will assume, without deciding, that such personal guarantees are liabilities properly to be considered in determining insolvency. Nevertheless, we conclude that the evidence of Select's net sales, standing alone, does not establish the amount of Forrest's liability on the guarantees at or near the date of the transfer. Without evidence regarding which government contracts still were uncompleted at or near that date, and the remaining amount of the bonding commitments connected therewith, there is no evidence to show the amount of Forrest's contingent liability at that time.

■ Based on this record, we conclude, as a matter of law, that there is no evidence to support the trial court's finding that Forrest Hudson was rendered insolvent by the subject transfer. For these reasons, we will reverse the trial court's judgment and enter final judgment in favor of Judith E. Hudson, individually and as executor of the estate.

*Reversed and final judgment.*