PRESENT: All the Justices

ALAN M. GRAYSON, ET AL.

v. Record No. 191413

WESTWOOD BUILDINGS L.P.

VICTOR KUBLI, ET AL.

v. Record No. 191414

WESTWOOD BUILDINGS L.P.

CARLA G. COLEMAN

v. Record No. 191475

WESTWOOD BUILDINGS
LIMITED PARTNERSHIP[1]

OPINION BY
JUSTICE D. ARTHUR KELSEY
JUNE 24, 2021

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

After securing judgments for unpaid rent against two tenants, a landlord filed suit against

both tenants and seven other parties for fraudulent and voluntary conveyances and against one of

the seven other defendants for conversion. After a lengthy series of pretrial motions, hearings, a

bench trial, and post-trial motions (creating a record just short of 6,000 pages), the trial court

issued a 51-page letter opinion finding in favor of the landlord against all of the defendants

except two, making each jointly and severally liable with in personam judgments for the unpaid

rent, the landlord's attorney fees, and sanctions. The landlord also succeeded on its conversion

count that it had alleged against a single defendant. On appeal, the appellants assert that the trial

---

[1] We consolidated two of these three cases, Record Nos. 191413 and 191414, for
purposes of briefing and the filing of a joint appendix. Because of the related nature of the
arguments in all three cases, however, we have consolidated all three for purposes of this
opinion. References to the Joint Appendix will be to the Joint Appendix filed in Record Nos.
191413 and 191414.

court misapplied Virginia law and made factually insupportable findings. For the following reasons, we agree and reverse.

## I. BACKGROUND FACTS

Alan Grayson and Victor Kubli were partners in a law practice from the 1990s through 2013, except for certain years when Grayson did not practice law while he served in Congress. The legal name of the firm was Grayson & Kubli, P.C., which was later changed to AMG TR PC ("G&K/AMG"). At all times, Grayson was the sole owner of G&K/AMG. Kubli was an employee of the firm.

In November 2007, Westwood Buildings Limited Partnership leased office space to G&K/AMG. The lease contained a provision prohibiting G&K/AMG from subleasing the premises or assigning the lease without Westwood's permission and stating that such a sublease or assignment would not relieve G&K/AMG from its obligations under the lease. *See* 3 J.A. at 1117-18. The lease went on to state:

> [G&K/AMG] assigns to [Westwood] any amount due from any assignee or subtenant as security for performance of [G&K/AMG's] obligations pursuant to this Lease. . . . [G&K/AMG's] obligations pursuant to this Lease shall be deemed to extend to any subtenant or assignee. [G&K/AMG] shall cause each subtenant or assignee to comply with such obligations. Any assignee shall be deemed to have assumed obligations as if such assignee had originally executed this Lease . . . .

*Id.* at 1118.[2] Finally, in the lease, G&K/AMG granted Westwood "a security interest in [G&K/AMG's] existing or hereafter acquired inventory . . . [and] other assets which are located

---

[2] Westwood asserts that this assignment gave it priority status over later creditors. *See* Appellee's Br. (Record Nos. 191413, 191414) at 26-27. The trial court did not address this assertion. We believe it merits brief mention. In the context of this lease agreement, the assignment was merely security for G&K/AMG's performance of its lease obligations and only applied to "any amount due," 3 J.A. at 1118, from K&A to G&K as it related to rent payments. Westwood provided no authority for its argument that the assignment was for any amount due of

2

in the Premises or used in connection with the business to be conducted therein, and assignments and subleases of this Lease, the Premises or part thereof." *Id.* at 1124. The lease required G&K/AMG, at Westwood's request, to execute a financing statement or other document evidencing or establishing such a security interest, but no such document appears in the record.[3] Neither Grayson nor Kubli signed a personal guaranty on the lease.

After being elected to Congress in 2008, Grayson wound up his law practice and sold it to Kubli & Associates, P.C. ("K&A"), a new firm owned solely by Kubli. The terms of the sale were embodied in a Buy-Out Agreement between G&K/AMG and K&A. The Buy-Out Agreement stated, in relevant part:

> WHEREAS it is anticipated that during the calendar year 2008, [G&K/AMG] has recorded and will record approximately $2 million in legal fees and expenses billed or to be billed at regular hourly rates to clients responsible to pay such fees and expenses without regard to the outcome of their cases;
>
> WHEREAS some of the work that [G&K/AMG] performs is billed, in whole or in part, on the basis of legal fees and expenses billed at regular hourly rates to clients responsible to pay such fees and expenses without regard to the outcome of their cases, and some of the work is not;
>
> WHEREAS [K&A] and [G&K/AMG] are unable to agree on the value of certain contingent fee cases;
>
> NOW, THEREFORE, it is AGREED that:
>
> 1. The Assets include the assets of [G&K/AMG] necessary to carry on the practice of law as [G&K/AMG] has conducted that practice, including [G&K/AMG's] retainer agreements with all clients; [G&K/AMG's] rights and obligations as an employer of

---

any nature to G&K from K&A, including amounts due pertaining to other collateral for other agreements besides the lease, *see* 4 *id.* at 1543 n.1; R. at 1108-09.

[3] In the trial court, Westwood expressly disclaimed reliance upon the security-interest provision in the lease. *See* R. at 4135-36 ("We're not relying upon that provision. We're relying upon the . . . assignment provision."). We see no reason to address the issue further because Westwood's security interest was not perfected and, thus, Westwood was not a "senior secured creditor," Appellee's Br. (Record Nos. 191413, 191414) at 27, even assuming that this provision applies to the funds and assets at issue in this case. *See* Code § 8.9A-322(a)(2) (giving priority to perfected over unperfected security interests).

legal and support staff; [G&K/AMG's] rights in its lease, insurance and subscriptions (to the extent transferable); [G&K/AMG's] law library; [G&K/AMG's] office equipment and furniture . . . ; [G&K/AMG's] books, records and case files; and permits and licenses held by [G&K/AMG].

. . . .

4. [G&K/AMG] shall retain all right, title and interest in all compensation derived for services actually rendered before the Buy-Out Date, including but not limited to all personal services rendered by Grayson before the Buy-Out Date (the "Pre-Buyout Compensation") . . . .

5. [K&A] shall cooperate in [G&K/AMG's] efforts to collect the Pre-Buyout Compensation . . . . Such cooperation will be without charge, as part of the compensation received by [G&K/AMG] under this Agreement.

6. [K&A's] bookkeeper will provide assistance to [G&K/AMG] and Grayson in the preparation of all tax returns for periods preceding the Buy-Out Date, in whole or in part, or referring or relating to this Agreement, or to compensation received under this Agreement. Such assistance shall be without charge, as part of the compensation received by [G&K/AMG] under this Agreement. . . .

7. [K&A] assumes as a liability all debt that [G&K/AMG] owes to Grayson as of the Buy-Out Date (the "Grayson Debt"). The Grayson Debt accrues interest, both before and after the Buy-Out Date, at a rate of 12% (Twelve Percent) per year, compounded annually. All amounts of Pre-Buyout Compensation shall be credited against the Grayson Debt when received, whether received by [G&K/AMG] or [K&A]. The remainder of the Grayson Debt shall be payable only if, as and when the revenue of [K&A] permits payment, within sixty days of such date.

. . . .

9. As compensation for the assets for which [K&A] and [G&K/AMG] agree on a value, [K&A] shall pay [G&K/AMG] $2 million (Two Million Dollars) in principal payments over 48 months. The payment shall be due on the last day of each month, starting in April 2009. The interest rate on these payments shall be 12% (Twelve Percent). . . .

. . . .

11. Kubli shall not be personally liable for the payments due under this Agreement. As security for the payments due under this Agreement, [G&K/AMG] or Grayson, or any designee of [G&K/AMG] or Grayson, may record a security interest in

4

[K&A's] assets, its receivables or its stock, or any combination thereof.

12. Because [G&K/AMG] and [K&A] are unable to agree on the value of certain contingent fee cases, *e.g.*, the "Kargo" case, the "IDT" cases, the "Escheat" cases and the "Derivium" cases, for [G&K/AMG's] contingent fee cases, [G&K/AMG] shall receive the entire amount of such fees if, as and when they are collected, unless [G&K/AMG] and [K&A] agree otherwise in writing. Such fees shall be deemed earned in full as of the date . . . the contingent fee agreement was made. If no dated, written retainer agreement is available as of the Buy-Out Date, this date shall be the date when services in the contingent fee matter were first rendered, as reflected in the books and records of [G&K/AMG]. As part of the compensation received by [G&K/AMG] under this Agreement, [K&A] shall continue the litigation of such cases without charge to [G&K/AMG] unless [G&K/AMG] consents to dismissal (or the client requests dismissal without [K&A's] solicitation to do so, or the Rules of Professional Conduct or Federal Rule of Civil Procedure 11 or other applicable law requires dismissal).

*Id.* at 1141-45.

Paragraph 7 of the Buy-Out Agreement addressed the "Grayson Debt." *See id.* at 1143. Both Grayson and Kubli acknowledged that Grayson had kept G&K/AMG afloat for many years by the infusion of his personal funds. According to the evidence at trial, Grayson's prior advances of personal funds amounted to approximately $2.816 million. *See, e.g.*, *id.* at 1111. In paragraph 7 of the Buy-Out Agreement, K&A agreed that it would assume all liability for this debt.

By its own terms, the Buy-Out Agreement went into effect on January 2, 2009, though it is not clear exactly what date the parties signed the document. On the same day, January 2, G&K/AMG and K&A also entered into a lease assignment, with Westwood's consent, whereby G&K/AMG agreed to remain liable under the lease but K&A assumed all obligations under the lease.

G&K/AMG followed through on the permission granted in the Buy-Out Agreement to obtain a security interest in all of K&A's assets. K&A executed a promissory note in favor of

5

G&K/AMG for the $2 million dollar purchase price for the firm's assets. Because the original 2009 note was unavailable at the time of trial, an unsigned copy was entered into evidence.[4] K&A also executed a security agreement in favor of G&K/AMG (the "K&A Security Agreement") that became effective on September 28, 2009, though the parties dispute the date that it was signed.[5] Both documents refer to the "even date" of the other, *see id.* at 1065, 1068, presumably referring to the effective date of September 28, 2009, stated in the K&A Security Agreement. G&K/AMG recorded a UCC financing statement regarding the security interest in November 2010.

Shortly after the Buy-Out Agreement, G&K/AMG executed a security agreement (the "G&K/AMG Security Agreement") in favor of Grayson that assigned G&K/AMG's assets to Grayson in repayment for the Grayson Debt. The G&K/AMG Security Agreement provided that "[u]nder no circumstances will [Grayson] advance any funds after December 31, 2009, at which time the entire amount advanced as of that date shall become due and payable." *Id.* at 1071. By its terms, the agreement became effective as of January 2, 2002. The parties signed the

---

[4] At trial, the court admitted the document over Westwood's objections. *See* R. at 3575. The trial court, in admitting the promissory note pursuant to Code § 8.3A-309, stated that Grayson had not transferred the original document and that Grayson had "testified for trial that he has not been able to reasonably obtain possession of the instrument." *See* R. at 3573. By admitting the copy of the promissory note, the trial court accepted Grayson's explanation that his ex-wife had taken the signed version of the document and that her lawyer had lost the document, *see id.* at 3390-93.

[5] Westwood argues that this agreement was backdated. The attorney who prepared it disagreed at trial, *see id.* at 1480-81, but the point is legally irrelevant. The agreement was not backdated in any nefarious sense. The debt was preexisting, and the parties were merely executing a security agreement pertaining to a preexisting debt. A security agreement need not be executed at the same time as the instrument creating the debt. *See* 8A [pt. 2] David Frisch & Scott Siegner, Lawrence's Anderson on the Uniform Commercial Code § 9-203:244, at 343 (3d ed. 2017 rev. of vol. 8A pt. 2) ("There is no requirement that the security agreement be executed prior to, or contemporaneous with, the bill of sale in order that the secured creditor acquire a purchase money security interest in the collateral."). The only date that is pertinent to our analysis is the date that the UCC financing statement pertaining to this debt was filed, which is the date that the security interest was perfected.

agreement but did not include dates next to their signatures. Grayson recorded a UCC financing statement regarding the security interest in December 2010.

Gene Brown, Grayson's attorney, testified that Grayson and G&K/AMG had executed the agreement sometime in late 2010 and acknowledged that the agreement used G&K/AMG's new name, AMG, which had not existed until December 28, 2009. *See* R. at 1476-77. At some point, G&K/AMG executed an irrevocable assignment coupled with an interest in favor of Grayson, assigning to Grayson all of its rights and interest in the Buy-Out Agreement and in the K&A Security Agreement. An unsigned copy of the assignment, made "effective as of the ___ day of September, 2009," was entered into evidence. *See* 3 J.A. at 1073.[6]

On November 30, 2010, after he had drafted and the parties had executed the G&K/AMG Security Agreement, Brown sent a letter to G&K/AMG giving it notice of its default under the agreement. The letter recited that G&K/AMG had requested further advances at the end of every year since December 2002 and that, by the terms of the agreement, all advances had ceased as of December 31, 2009, and all previous amounts advanced, which amounted to $2,816,281, had become due and payable on that date. G&K/AMG's failure to pay became a default on January 1, 2010. The letter stated that Grayson was exercising his rights under the G&K/AMG Security Agreement and the UCC and creating a lien on all of G&K/AMG's assets.

At approximately the same time that the Buy-Out Agreement went into effect, K&A entered into a loan agreement with The GSA Telecommunications Trust ("GSA"), another of

---

[6] As it had with the promissory note, the trial court admitted the irrevocable assignment into evidence over Westwood's objections. In admitting this document, the trial court expressly credited Grayson's testimony about his ex-wife having taken this document as well. *See* R. at 4273 ("I believe they have explained that Mr. Grayson's ex-wife took all his documents so they've been unable to produce it. . . . And they didn't have a . . . hand in its destruction or non-production. It's in the hands of a third party according to the testimony, so I admit the document."); *see also id.* at 3437, 4236-37.

Grayson's entities, which bore an effective date of January 12, 2009 (the "GSA Loan Agreement"). This agreement recited that K&A's expenses now "exceed[ed] its immediate income" and stated that "GSA may lend, or cause to be lent, funds to K&A" but that GSA could provide such funds through itself, G&K/AMG, or Grayson Consulting, Inc. ("GCI") (another Grayson entity), among other entities. *Id.* at 1066. The agreement provided for interest and stated that "GSA's purpose in entering into this arrangement is to make a profit. Money lent under this agreement shall be deemed a business debt. It is created in connection with GSA's trade or business." *Id.* The loans would be secured by a lien on all of K&A's assets. The agreement stated that K&A appointed Gene Brown "as its attorney-in-fact to confess judgment against it in the circuit court" should K&A default. *Id.* at 1067 (emphasis and capitalization omitted). On December 30, 2009, Gene Brown, acting as agent for GSA and attorney-in-fact for K&A under the GSA Loan Agreement, executed a confessed judgment on behalf of K&A in favor of GSA in the amount of $1,133,901.45 with interest.

According to Westwood's property manager, K&A began to default on the lease in the summer of 2009. *See* 1 *id.* at 361. The only notices of default in the record, however, begin in January 2010, *see* 3 *id.* at 1154-78, and counsel for Westwood contradicted the property manager by stating at trial that the first default had occurred in December 2009, *see* R. at 1141. The complaint also alleges that the first default occurred "as early as December, 2009," which the complaint labels the "Claim Date." *See* 1 J.A. at 7. The default notices in the record extend from January 2010 through March 2011, but during this period K&A made some rent payments, intermittently reducing the amount of back rent that it owed to Westwood. By the end of this time period, K&A owed Westwood $78,921.70, or approximately 6 months' rent and fees.

In April 2011, Westwood obtained a consent judgment against only K&A for $91,010.99 (the amount of unpaid rent, fees, and interest) along with possession of the premises. On May

8

31, 2011, Westwood issued a garnishment summons against PNC Bank, where K&A held an account. G&K/AMG filed a petition to intervene in June 2011, claiming that the funds in K&A's account were "impressed with a valid and perfected lien in favor of [G&K/AMG] that is superior to the lien of Westwood Buildings' garnishment" because the lien in favor of G&K/AMG (as evidenced by the K&A Security Agreement and UCC financing statement) "was perfected and recorded prior to the date of service of the garnishment and, in fact, prior to the date that Westwood Buildings obtained a judgment." 3 *id.* at 1185-87. The petition also stated that K&A's secured debt to G&K/AMG was "in excess of $2,000,000." *Id.* at 1186. The court denied G&K/AMG's petition to intervene without prejudice for lack of subject matter jurisdiction. *See id.* at 1201-03. The court then ordered PNC Bank to pay Westwood $32,906.75, the remaining amount in K&A's account. *See id.* at 1207-09.

In 2011, Grayson's term in Congress ended, and he established a new firm, Grayson Law Center ("GLC"). GLC took over a case from K&A known as the *Halldorson* case while K&A wound up its business. When that case later settled in June 2011, Grayson directed that $120,000 in attorney fees be paid to himself. To effectuate this arrangement, Brown sent a letter to K&A reiterating that G&K/AMG was exercising its rights under the Buy-Out Agreement and K&A Security Agreement and stating that all of G&K/AMG's rights and interest under the Buy-Out Agreement had been transferred to Grayson. Brown and Kubli later both sent letters to the *Halldorson* defendants instructing them to make the checks payable to G&K/AMG. The *Halldorson* defendants then made the payments, and Gene Brown transferred the payments from his trust account to GLC. *See* Sealed Suppl. J.A. at 54-56.[7]

---

[7] We sealed this volume of the Joint Appendix, and the trial court sealed portions of the record below, *see id.* at 977-80, 1001-02. To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed.

From May 2011 to September 2012, GLC received $1.8 million in monthly installments from another client, IDT.[8] The parties disagreed below as to whether these funds were for work that G&K/AMG had done prior to Grayson entering Congress or for new work that Grayson was doing for IDT in 2011 and 2012. Grayson testified that he had entered into a new oral retainer agreement with IDT after leaving Congress, while Westwood contended that the payments were for work done while Grayson had been at G&K/AMG and thus represented funds that G&K/AMG had placed beyond the reach of Westwood.

To support its contention, Westwood presented evidence that in 2015, Carla Coleman, the bookkeeper for the Grayson and Kubli entities, had stated in an interview that she thought the IDT payments had been for work performed in 2006, 2007, and 2008. She later clarified in her deposition and at trial that she thought the payments had been for the new oral retainer agreement in 2011 between IDT and GLC. Grayson and Coleman testified that IDT had made two large, lump-sum payments in 2009 and 2010 to G&K/AMG for its prior legal work for IDT. Grayson also testified that these and other IDT payments had reduced the Grayson Debt mentioned in the Buy-Out Agreement. One of these two lump-sum payments funded, in large part, the GSA loan to K&A.

Between January and June 2011, G&K/AMG transferred $42,041.67 to GLC, to GCI, and to Grayson himself. The payments included a $30,000 payment from G&K/AMG to GLC, a $2,500 payment from G&K/AMG to GCI, a $3,000 payment from G&K/AMG to Grayson, and another payment of $6,541.67 from G&K/AMG to Grayson. *See* R. at 5530, 5533-34, 5550. When G&K/AMG made the first of these payments, GLC had not yet been formed as a legal entity. Grayson testified that these payments had gone to reduce the debt that G&K/AMG owed

---

[8] The parties appear to agree on this figure. However, by our count, the IDT transfers amount to $1.7 million. *See* Sealed Suppl. J.A. at 90-93.

to him personally and that they had been made to provide a loan to GLC and to close down the G&K/AMG account. The transfers left only $100 in G&K/AMG's bank account.

In 2012, Grayson was again elected to Congress, and Kubli formed another entity, the Law Office of Victor A. Kubli, P.C. ("LOVAK"), as a successor to GLC. In October 2013, K&A's accountant amended K&A's 2011 tax return to note a "[c]ancellation of [d]ebt" in the amount of $2,802,966, stating that "[l]oans had been written off as a bad debt by the lender." *See* Sealed Suppl. J.A. at 167. The amended return also noted that assets in the amount of $1,594,641 had been "taken back by AG." *Id.* at 166 (altering capitalization). Grayson emphatically denied ever forgiving any of K&A's debt; Kubli agreed with Grayson. *See* 2 J.A. at 595-96, 849-50; 3 *id.* at 979-80.

In March 2013, after filing a second action (this time against both G&K/AMG and K&A), Westwood obtained a judgment against both entities for $238,017.11 for past-due rent and fees, $25,500 in attorney fees, and interest. Westwood obtained an additional judgment against G&K/AMG for $58,104.24 plus interest.

## II. WESTWOOD'S PRESENT ACTION

After completing post-judgment debtor's interrogatories in the second action, Westwood filed the present action against Grayson, Kubli, G&K/AMG, K&A, GLC, GSA, GCI, LOVAK, and Coleman. The complaint alleged fraudulent conveyances in violation of Code § 55.1-400, voluntary conveyances in violation of Code § 55.1-401,[9] breach of fiduciary duty (against Grayson, Kubli, and Coleman only) under the trust fund doctrine, conversion (against Grayson only), statutory conspiracy under Code §§ 18.2-499 and -500, and common-law conspiracy. The

---

[9] In 2019, the General Assembly re-codified Code §§ 55-80 and -81 and renumbered them as Code §§ 55.1-400 and -401, respectively. *See* 2019 Acts ch. 712, at 1360. For purposes of this opinion, we will refer to these statutes using their new codifications.

11

defendants asserted pleas in bar based upon the statute of limitations or laches and alleged res judicata pertaining to the prior, second action. The trial court sustained the pleas in bar regarding the statute of limitations as to all counts except the fraudulent conveyance, voluntary conveyance, and conversion counts. The court also sustained Coleman's demurrer based on the complaint's failure to allege sufficient facts against her, and Westwood filed an amended complaint as to Coleman.

Following a bench trial, the court issued a 51-page letter opinion ruling in favor of Westwood. After dismissing all claims against GCI for failure to serve the correct entity, the trial court found that the Buy-Out Agreement and GSA Loan Agreement were unenforceable. The court made several statements, however, specifically addressing Grayson's intent:

> From the provision or allowance of use of operating funds *it is inferable that Grayson did not set out to defraud creditors.* However, he certainly constructed a scheme he thought would permit him to hedge his bets as to the viability of the new entity, and place the risk of failure onto the shoulders of creditors if he so chose.

1 J.A. at 90 (emphasis added).[10] When later addressing attorney fees, the trial court stated that it did not believe that Grayson had had "the intent to, you know, create a fraudulent scheme where he wouldn't pay the landlord at all because there were payments made." 3 *id.* at 1008.

---

[10] The trial court also made other factual findings indicating the absence of an intent to defraud. In the portion of its opinion addressing attorney fees, the court stated that Grayson had "attempt[ed] to rely on the shield against creditors he believed he had validly constructed to interfere with their claims." 1 J.A. at 106. In declining to award punitive damages, the court stated that "Grayson was mistaken in his belief he was entitled to divert [the] *Hal*[*l*]*dorson* Settlement Proceeds away from payment to K&A" but that his conduct "[did] not amount to malice or a conscious disregard of the rights of others." *Id.* at 115. In declining to revisit a pretrial ruling, the court stated that it was "of the view . . . that the Defendants did not act with 'actual malice,' i.e., 'ill-will, hatred, or spite directed toward the Plaintiff'" but instead "under the mistaken belief various transactions were supported by adequate consideration and that their agreements would not be found to lack mutuality, to them an unforeseen eventuality." *Id.* at 123 (alteration and citation omitted).

The court nonetheless concluded that the agreements between Grayson and Kubli had "lacked mutuality" and had "masked the simplicity of the express and consummate failure of consideration." 1 *id.* at 90. As the court explained its legal reasoning,

> Kubli and K&A promised nothing of value to [G&K/AMG], GSA and Grayson. The arrangement allowed Kubli to depart the entity at will, with no consequence or obligation for any debts. K&A could shutter its doors upon its fancy. In sum, there was nothing of value exchanged and any promises [were] illusory and of no binding significance.

*Id.* Bolstering this conclusion, the court stated, "[e]ven if the [c]ourt were found to be wrong in its conclusion the agreements were invalid, the relevant individual transfer transactions are unsupported by adequate consideration and/or were made to entities unentitled to receive the same. The result under either theory is the transfers are legally reachable by [Westwood] . . . ." *Id.* at 93-94.

The trial court rejected several of the defendants' assertions. It discounted any suggestion that Coleman had been a "mere conduit" of the transactions, citing as an example the fact that she had sent an email to Westwood stating that K&A's back rent would be paid after the *Halldorson* proceeds had come in. *See id.* at 100-01. It found that the IDT payments had been made for previous work done by G&K/AMG rather than pursuant to a new oral retainer agreement with GLC in 2011, and it discredited Grayson's and Coleman's testimony to the contrary. The court also rejected Grayson's testimony that he had not forgiven K&A's debt irrespective of the asset take-back and the debt write-off noted on K&A's amended 2011 tax return. The court further stated that it was unconvinced that the Grayson Debt had ever existed in such a form as to create a lawful-preference defense because of "[t]he lack of documentation, specificity or evidence other than vague oral testimony" regarding its existence. *See id.* at 103. Because the court had previously found the agreements creating the debt to be void, however, the court recognized that the forgiveness of that debt could not be a "conveyance" under either the

13

fraudulent or voluntary conveyance statutes. *See id.* at 104. Even so, the court stated, "[t]o the extent the 'loans' [were] not void, the [c]ourt conversely [found] that, in such event, the transfers made in contemplation of claimed repayment thereof were unlawful." *Id.*

The trial court did not actually void any specific conveyances or order any conveyed funds to be returned to the debtors' estates to be ratably distributed to all creditors. Instead, the court entered in personam, joint-and-several judgments in the amount of $380,864.91 (the original amount of claimed back rent, fees, and costs), as well as interest, costs, and reasonable attorney fees, against all defendants except GCI (which it had dismissed) and LOVAK (for which the court could not determine the amount of reachable assets that it had possessed as the successor to GLC at the time of the transfers). Under the court's order, Westwood could collect these judgments from any and all defendants, subject to an overall cap of $478,220.69, which represented the then-due amount for back rent and fees. The court also imposed statutory sanctions on the seven remaining defendants in the amount of $150,000.

Regarding the voluntary conveyance claim, the court found that the transfers at issue had "unquestioningly [been] made at a time when G&K[/AMG] and K&A were insolvent" and re-emphasized the lack of mutuality and consideration in the agreements, the lack of adequate consideration for the transactions, and the timing of the transactions (after G&K/AMG and K&A had already become indebted to Westwood). *See id.* at 109-10. The court entered the same in personam, joint-and-several judgments against the same defendants whom the court had found liable for fraudulent conveyances.

Addressing the conversion claim, the court held that Westwood's lien created by the garnishment summons had covered any of K&A's receivables due at the time that the garnishment had been placed into the sheriff's hands and thereafter. *See id.* at 110-13. The court also added that even if this conclusion were incorrect, the lien extended to at least the amount on

14

the garnishment summons ($95,998.44 plus costs and interest), "which in any case now exceeds the $120,000.00 claimed." *Id.* at 113.

Finding that Grayson's claim of priority status over Westwood's lien on K&A's assets was a question of law, the court held that Grayson's claim did not provide Grayson with "a basis to prematurely help himself to funds subject to the reach of the fieri facias." *See id.* Because the Buy-Out Agreement and GSA Loan Agreement had "lacked mutuality and consideration," the court added, "the resulting confessed judgment and financing statement therefore obtained liens of no validity," and Grayson's transfers to himself and his entities based upon these void agreements "are invalid beyond the bar already posed by the issuance of the fieri facias." *Id.* at 113-14. Once again, the court added, even if it were wrong, "[t]he funds belonged to K&A," which "was in no legal position to concur in the diversion of receivables in derogation of the writ." *Id.* at 114. "It does not matter ultimately," the court concluded, "whether the lien could be resolved in favor of [Grayson] or [Westwood], for the wrong is to convert the funds in derogation of the fieri facias before the status of competing liens and the consequent entitlement of funds pursuant thereto is judicially resolved." *Id.* The court then found against Grayson and awarded $120,000 to Westwood, along with interest, costs, and attorney fees. *See id.* The court declined to award punitive damages.

The seven defendants subject to the trial court's various judgments bring three cases to us, which we have consolidated for purposes of this opinion. *See supra* note 1. On a multitude of issues, these appellants contend that the trial court misapplied Virginia law and based its conclusions upon insupportable factual findings. We will first address the governing legal principles and then examine each of the trial court's findings in detail.

15

III. GOVERNING LEGAL PRINCIPLES

A. Fraudulent and Voluntary Conveyances

The trial court's opinion addresses various aspects of Virginia law concerning fraudulent and voluntary conveyances. The court presents several of its holdings as alternative grounds for ruling in favor of Westwood on a particular issue. To respond fairly to each of the court's various holdings, we must first survey Virginia law pertaining to these doctrines.

Code § 55.1-400 codifies the principles of fraudulent conveyances and provides:

> Every (i) gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal, (ii) action commenced or order, judgment, or execution suffered or obtained, and (iii) bond or other writing given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers, or other persons or their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Code § 55.1-401 codifies the principles of voluntary conveyances and provides:

> Every gift, conveyance, assignment, transfer, or charge that is not upon consideration deemed valuable in law, or that is upon consideration of marriage by an insolvent transferor or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts were contracted at the time such gift, conveyance, assignment, transfer, or charge was made but shall not, on that account merely, be void as to creditors whose debts have been contracted, or as to purchasers who have purchased, after such gift, conveyance, assignment, transfer, or charge was made. Even though it is decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers.

These statutes generally presuppose a conveyance by the debtor from the debtor's estate.

*See* Kent Sinclair, Sinclair on Virginia Remedies § 48-2[B], at 48-10 (5th ed. 2016) (describing

16

the existence of "a transfer from the debtor's estate" as "[a] basic requirement").[11]  They seek to

balance two competing public policies:  the "public interest that debts should be paid" and "the

debtor's freedom to alienate his own property."  *Id.* § 48-2[A], at 48-7; *see also* Doug

Rendleman, Enforcement of Judgments and Liens in Virginia § 11.1, at 11-4 to -5 (3d. ed. 2014

& Supp. 2020) (describing these two conflicting policies).

### B.  In Personam Judgments

Both statutes contain a specific remedy — a judicial decree declaring the conveyance

void as to the transferor's creditors.[12]  "This remedy returns the fraudulently conveyed assets to

the transferor, but, as a general rule, it does not authorize 'a court to award an in personam

judgment when the transaction is set aside.'"  *La Bella Dona Skin Care, Inc. v. Belle Femme

Enters., LLC*, 294 Va. 243, 256 (2017) (alteration omitted) (quoting *Mills v. Miller Harness Co.*,

229 Va. 155, 158 (1985)).  The fraudulent conveyance statute does not by its terms "impose

liability upon the participants of a fraudulent conveyance."  *Id.*; *see also Cheatle v. Rudd's

Swimming Pool Supply Co.*, 234 Va. 207, 212 (1987).  Neither does the voluntary conveyance

statute.  The default remedy under both statutes is to declare the conveyance void as to the

---

[11] *See also* 1 Garrard Glenn, Fraudulent Conveyances and Preferences § 55, at 76 (rev. ed. 1940 & Supp. 1950) ("That there must be a transfer, or some other change in title, is clear on its face."); 1 *id.* § 139, at 258 (rev. ed. 1940) (repeating that there must be "an alienation of some sort"); 1 Dewitt C. Moore, A Treatise on Fraudulent Conveyances and Creditors' Remedies at Law and in Equity 3-4 (1908) (observing that the property "must be transferred or disposed of by the debtor"); Frederick S. Wait, A Treatise on Fraudulent Conveyances and Creditors' Bills § 15, at 34 (3d ed. 1897) (same).

[12] *See* Code § 55.1-400 (stating that fraudulent conveyances "shall . . . be void"); Code § 55.1-401 (stating that voluntary conveyances "shall be void"); *see also* Code § 55.1-402 (stating that a creditor may institute an action "to avoid" a transfer by using these statutes and that the creditor is also entitled to "all the relief with respect to such estate to which he would be entitled after obtaining a judgment for the claim"); Code § 55.1-403 (providing for the award of attorney fees and sanctions when the transfer "is declared void" pursuant to these statutes); Code § 55.1-404 (authorizing a court to "set aside a fraudulent conveyance or voluntary transfer" during an action to execute on a judgment if all the relevant parties "are given notice of the proceeding").

complaining creditor and then to "return[] the fraudulently conveyed assets to the transferor," *La Bella Dona*, 294 Va. at 256; *Bennett v. Garner*, 913 F.3d 436, 441 (4th Cir. 2019) (citation omitted), for a judicially administered "ratable distribution" of the conveyed funds between competing creditors, *see Mills*, 229 Va. at 158. *See generally* 1 Glenn, *supra* note 11, §§ 56, 74, 239-39a, at 77, 121-24, 413-17 (rev. ed. 1940 & Supp. 1950).

Since the Elizabethan age, however, courts have supplemented these statutory remedies.[13] One available, but rarely used, equitable remedy was an in personam judgment directly against a transferee of an unlawful conveyance.[14] In the 236 years since Virginia adopted its first fraudulent conveyance statute, *see* 1785 Acts ch. 64, at 53-54, we have continued this tradition by recognizing this "narrow exception" allowing a chancellor to enter an in personam judgment against a transferee of a fraudulent cash transfer. *See La Bella Dona*, 294 Va. at 256 (citing *Price v. Hawkins*, 247 Va. 32 (1994)).

The in-personam-judgment exception applies to "recipients of fraudulent cash transfers" and not to "other participants or coconspirators" in the fraudulent scheme. *Id.*; *see Price*, 247 Va. at 33, 37-38 (addressing a claim of "fraudulent conveyances of cash"). The exception "unw[inds] the transfer of the cash in the grantee's pockets; it [does] not impose liability upon

---

[13] *See generally* Orlando F. Bump & James McIlvaine Gray, A Treatise upon Conveyances Made by Debtors to Defraud Creditors §§ 13-14, at 9-10 (4th ed. 1896) (recognizing that "the common law supplements the statute"); 1 Glenn, *supra* note 11, §§ 58, 61d, at 79-81, 95-96 (rev. ed. 1940) (describing how both law and equity courts in England supplemented the statute, with the "result . . . that at the beginning of [the 20th] century, the law of fraudulent conveyances was a mosaic of statutes and decisions, which had been developed around the Statute of Elizabeth").

[14] *See, e.g.*, *Clements v. Moore*, 73 U.S. (6 Wall.) 299, 312-13 (1867) (holding a fraudulent purchaser liable); *Williamson's Ex'r v. Goodwyn*, 50 Va. (9 Gratt.) 503, 506-07 (1852) (permitting personal decrees); *Greer v. Wright*, 47 Va. (6 Gratt.) 154, 159-60 (1849) (same). *See generally* Bump & Gray, *supra* note 13, § 623, at 600-01; 1 Glenn, *supra* note 11, § 56, at 77 (rev. ed. 1940); 2 Moore, *supra* note 11, at 678-81; Wait, *supra* note 11, §§ 177-79, at 321-26.

the grantee by virtue of his participation in the transaction." *La Bella Dona*, 294 Va. at 256-57.

*See generally* 15A William Meade Fletcher & Carol A. Jones, Fletcher Cyclopedia of the Law of

Corporations §§ 7413-14, at 165-71 (2018 rev. vol.); Rendleman, *supra*, § 11.5[H], at 11-51 to -

54 (3d ed. 2014 & Supp. 2020); Sinclair, *supra*, § 48-2[B], at 48-25 to -27 (5th ed. 2016 & Supp.

2020). We have not foreclosed the possibility of other narrow exceptions to the general rule

disfavoring in personam judgments, but truly exceptional circumstances would need to exist for

us to do so.

### C. The Debtor-Creditor Relationship

The fraudulent and voluntary conveyance statutes principally target conveyances that

prejudice "creditors" of the transferor. *See* Code §§ 55.1-400 to -401; *see also* Sinclair, *supra*,

§ 48-2[B]-[D], at 48-10, 48-15 to -16, 48-24 to -25, 48-29, 48-34 to -35 (5th ed. 2016 & Supp.

2020). With respect to existing creditors, the fraudulent conveyance statute does not require

proof of actual fraud in its traditional sense. It is enough that the debtor made the conveyance

"with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what

they are or may be lawfully entitled to." Code § 55.1-400. Virginia courts treat the culpable

intent required for "delay" or "hinder" liability as a form of "legal or constructive fraud." *See*

*Darden v. George G. Lee Co.*, 204 Va. 108, 112 (1963) (citation omitted); *see also* Sinclair,

*supra*, § 48-2[B], at 48-14 (5th ed. 2016 & Supp. 2020).

A different liability paradigm governs allegations of fraudulent conveyances that occur

before the debtor-creditor relationship exists.[15] Courts and commentators refer to this class of

---

[15] No such paradigm exists with voluntary conveyances because Code § 55.1-401, first enacted in 1849, *see* Code 1849, ch. 118, § 2, at 508, applies only to "creditors whose debts were contracted at the time such gift, conveyance, assignment, transfer, or charge was made," Code § 55.1-401. *See Consolidated Tramway Co. v. Germania Bank*, 121 Va. 331, 335-36 (1917) (holding that a voluntary conveyance under the statute is "only void as to antecedent debts, and may be wholly sustained as to those coming into existence after its date" (citation omitted)).

creditors as "subsequent creditors." "With respect to subsequent creditors," Chief Justice Marshall dryly remarked, "the application of [the Elizabethan fraudulent conveyance] statute appears to have admitted of some doubt." *Sexton v. Wheaton*, 21 U.S. (8 Wheat.) 229, 243 (1823). Among Virginia jurists, admittedly, it "has been the subject of a most animated and elaborate discussion." *Johnston v. Zane's Trs.*, 52 Va. (11 Gratt.) 552, 559 (1854). Despite differing views on whether indebtedness at the time of a voluntary conveyance rendered the conveyance prima facie, as opposed to conclusively, void under the voluntary conveyance statute, Virginia jurists ultimately agreed "that in the case of a subsequent creditor, a [voluntary conveyance] cannot be impeached on the mere ground of its being voluntary, if there be no actual fraudulent view or intent at the time it is made." *See id.* Instead,

> [t]o let in such a creditor, it must be shown that there was mala fides or fraud in fact in the transaction. And if this be shown, whether the actual fraudulent intent relate to existing creditors or (as it may) be directed exclusively against subsequent creditors, the effect is the same, and the subsequent creditor may upon the strength of it successfully impeach the conveyance.

*Id.* at 560; *see also Witz v. Osburn*, 83 Va. 227, 229 (1887) (requiring "actual fraud" for "subsequent debts"). "[S]ubsequent creditors, . . . in the absence of actual fraud, occupy no higher ground than their debtors." *Payne v. Hutcheson*, 73 Va. (32 Gratt.) 812, 816 (1880).

To prove this genre of fraud in the subsequent-creditor context, "the burden is upon the subsequent creditor to show that a prospective fraud was *contemplated and directed against him.*" *Gray v. McCormick*, 181 Va. 52, 60 (1943) (emphasis added); *Richardson v. Pierce*, 105 Va. 628, 631 (1906); *see Hutchison v. Kelly*, 40 Va. (1 Rob.) 123, 130 (1842) (opinion of Baldwin, J.) (stating that subsequent creditors can prevail only by showing "either a prior indebtedness, or a prospective fraud against them only"). Put another way, the debtor-grantor must make the conveyance "with an intent to put the property out of the reach of debts which the grantor at the time of the conveyance intends to contract, and which he does not intend to pay, or

20

has reasonable grounds to believe that he may not be able to pay." Bump & Gray, *supra* note 13,

§ 292, at 328-29.[16] "There need not be an intent to contract any particular debt or debts. It is

sufficient if there is an intent to contract debts, and a design to avoid the payment of such debts

by the conveyance." *Id.* at 329. This burden is not an easy one to shoulder. *See, e.g.*, *Allsbrook*

*v. Azalea Radiator Serv., Inc.*, 227 Va. 600, 603-04 (1984) ("[E]ven if there had been a transfer

from [the putative debtor] to [a grantee] concerning the truck, it occurred *before* any

indebtedness to [the remote future creditor]; therefore, as regards [the remote future creditor],

there could not exist any intent to defraud." (emphasis in original)).[17]

The line separating existing and subsequent creditors can be blurred depending upon the

accrual date of the claimed debt. A tort victim, for example, may have a bona fide claim of an

---

[16] *See, e.g.*, *Graham v. La Crosse & Milwaukee R.R.*, 102 U.S. 148, 153 (1880) (describing, as a "special case" in which a subsequent creditor can set aside a transaction as fraudulent, a circumstance in which a "debtor dispose[s] of his property, with intent to defraud those to whom he expects to become immediately or soon indebted"). On this point, Professor Glenn summarized well the scope of a trial court's role:

> Hence the court has a duty, in the case of a subsequent creditor, that is quite different from the task which arises when the complaining creditor holds a claim which preceded the conveyance. The court must now find some connection between the act of the debtor and the liability which subsequently accrued, something to justify the statement that the debtor's conveyance was intended to injure the subsequent creditor.

1 Glenn, *supra* note 11, § 319, at 556-57 (rev. ed. 1940 & Supp. 1950).

[17] We leave for another day the question how these principles apply to the situation, not present here, where existing creditors successfully attack a fraudulent conveyance and create a recovered conveyance fund and subsequent creditors seek to participate in the fund so created. *See, e.g.*, *Hutchison*, 40 Va. (1 Rob.) at 129-30 (opinion of Baldwin, J.) (concluding that a fraudulent intent against one creditor is a fraudulent intent against all); Unif. Fraudulent Conv. Act § 9 note 8 (Nat'l Conf. of Comm'rs on Unif. State L. 1918) ("In England, if a conveyance is fraudulent as to any creditor, it can be treated as void or set aside by any other creditor, even though the conveyance was not fraudulent as to him. There are American cases in support of this proposition. The paragraph as drawn, however, expresses the dominant American rule, which is that only those creditors as to whom the conveyance is fraudulent, can proceed to set the conveyance aside." (citations omitted)).

inchoate "debt" against a tortfeasor because, at the time of the tort, the victim "*may* be lawfully entitled," Code § 55.1-400 (emphasis added), to damages, *see Luria v. Board of Dirs. of Westbriar Condo. Unit Owners Ass'n*, 277 Va. 359, 366 (2009); *Buchanan v. Buchanan*, 266 Va. 207, 212 (2003); *Bruce v. Dean*, 149 Va. 39, 46 (1927); *Johnson v. Wagner*, 76 Va. 587, 590 (1882). *See generally* 1 Glenn, *supra* note 11, §§ 339-40, at 586-90 (rev. ed. 1940 & Supp. 1950); 1 Moore, *supra* note 11, at 200-02. Similarly, a contracting party may have a bona fide claim of an existing or subsequent debt depending on "the nature of the contract," whether it makes payment subject to conditions, when any debt obligation has matured, and when payment is due on a matured debt obligation. *See* 1 Glenn, *supra* note 11, § 328, at 570 (rev. ed. 1940). In all such cases, however, a bona fide claim of a debt need not be reduced to judgment, and thus, "obtaining a judgment against a party is not a prerequisite to establishing creditor status." *Luria*, 277 Va. at 366; *see* Code § 55.1-402; *Buchanan*, 266 Va. at 212.

D.  Payment of Antecedent Debts

"In Virginia, our courts have gone as far, or farther, than any other, to sustain the owner's dominion," stating that that dominion includes the power to "prescribe the order in which the creditors are to be paid." *Quarles v. Kerr*, 55 Va. (14 Gratt.) 48, 54 (1857). A debtor's "right to prefer one creditor over another is thoroughly established" by Virginia precedent. *Peters v. Bain*, 133 U.S. 670, 686 (1890). We explained nearly a century ago that

> a debtor has the right to prefer one creditor to another. Giving such a preference is not fraudulent, though the debtor be insolvent, and the creditor is aware at the time that it will have the effect of defeating the collection of other debts. This is not hindering or delaying creditors, within the meaning of the statute. It does not deprive other creditors of any legal right, for they have no right to a priority.

*Neff v. Edwards*, 148 Va. 616, 627-28 (1927) (citation omitted).

22

"[A]s a debtor has the right to pay one creditor in preference to another, so he may, without the imputation of fraud, secure one creditor to prevent another from getting an advantage." *Williams v. Lord & Robinson*, 75 Va. 390, 402 (1881). "In such case other creditors are not lawfully entitled to any share in the assets transferred to the preferred creditor or creditors. What the law sanctions cannot be regarded as unlawful." *Surratt v. Eskridge*, 131 Va. 325, 335 (1921).[18] "To prefer one creditor to another" when neither has a lien "is not in contravention of any rule of law in this State." *Young v. Willis*, 82 Va. 291, 296 (1886). After all, the right to

> prefer one creditor over another results from the ownership of the property and the unrestricted power of alienation. The debtor, if no lien has attached, can sell it or transfer it to any creditor or purchaser, and apply the proceeds to any creditor he may desire; and if he may do so with the property, or its price, there would seem to be no good reason why he should not have the right to cover it by a deed of trust for the same purpose.

*Id.* at 298. Even "though the debtor be insolvent and the creditor is aware at the time that it will have the effect of defeating the collection of other debts," giving one creditor preference over another "is not hindering or delaying creditors within the meaning of the statute." *Johnson v. Lucas*, 103 Va. 36, 38 (1904).

Indeed, "[a] preference may be given and received for the express purpose of defeating an execution, for the mere intent to defeat an execution does not of itself constitute fraud." Bump & Gray, *supra* note 13, § 170, at 196-97 (footnote omitted). "It does not deprive other creditors of any legal right, for they have no right to a priority." *Id.* at 197. Nor does the preferred creditor

---

[18] *See generally* 15A Fletcher & Jones, *supra*, § 7421, at 194-99; 1 Glenn, *supra* note 11, § 289, at 488 (rev. ed. 1940 & Supp. 1950); Rendleman, *supra*, § 11.2[D], at 11-25 (3d ed. 2014).

23

> violate any principle of the statute when he takes payment or security for his demand, though others are thereby deprived of all means of obtaining satisfaction of their own equally meritorious claims, and though he may be aware of the intent of the debtor to defeat the collection of them. Fraud, in its legal sense, cannot be predicated of such a transaction.

*Id.* at 198 (footnote omitted). It necessarily follows that, "since 'a debtor has the right to pay one creditor in preference to another, so he may, without the imputation of fraud, secure one creditor to prevent another from gaining an advantage.'" *Irby v. Gardner*, 157 Va. 132, 139 (1931) (citation omitted).

The debt preferred, of course, must actually be owed to a "bona fide creditor" and cannot be "used as a cloak for some other purpose which is fraudulent in actual intent." *See Surratt*, 131 Va. at 335. "A conveyance for the sole purpose of discharging an honest debt," however, "is outside the statutory prohibitions against fraudulent conveyances." 15A Fletcher & Jones, *supra*, § 7406, at 139. A conveyance to a bona fide creditor presupposes that the debt is owed because of a legal or a moral duty to pay supported by consideration deemed valuable in law. Such an obligation can arise from ordinary contractual consideration[19] or a legally enforceable moral obligation.[20] *See generally* Sinclair, *supra*, § 48-2[C], at 48-30 to -34.

---

[19] *See Price v. Taylor*, 251 Va. 82, 85 (1996) ("[I]t is well established that mutual promises in a contract constitute valuable consideration."); *Brewer v. First Nat'l Bank of Danville*, 202 Va. 807, 815 (1961) ("[Consideration] may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made."); Rendleman, *supra*, § 11.2[C][4], at 11-19 (3d ed. 2014) (stating that transfers in consideration of antecedent debts constitute valuable consideration and that "[a] simple preference . . . is not a fraudulent conveyance"); *cf. Johnston v. George D. Witt Shoe Co.*, 103 Va. 611, 620 (1905) ("[A] sale made for a past or existing consideration is, with us, as valid and as free from legal wrong, if that be the only objection which can be urged to it, as though it were made for a present consideration.").

[20] *See Bruce*, 149 Va. at 50 (holding that a father's duty to "support the infant children created the relationship of creditor and debtor, and the debtor had a right to prefer this creditor to the exclusion of other creditors"). *See generally* 1 Moore, *supra* note 11, at 295-96; 1 Joseph Story & Isaac F. Redfield, Commentaries on Equity Jurisprudence § 353, at 340 (8th ed. 1861); Wait, *supra* note 11, § 215, at 387.

For over a century, it has been understood "that 'valuable consideration' in the statutes against fraudulent conveyances is to be taken . . . in the widest sense of the law of contracts." Melville Madison Bigelow, The Law of Fraudulent Conveyances 532 (Kent Knowlton ed., 1911). As Professor Rendleman has explained, "'Consideration deemed valuable at law' means, in effect, 'something,' or 'adequate consideration to support a contract.' The Virginia Code's language creates a standard that requires only that *something* of value be exchanged and does not require equivalence." Rendleman, *supra*, § 11.3[B], at 11-32 (3d ed. 2014 & Supp. 2020) (emphasis in original).

Virginia law has always recognized that paying or securing a legally enforceable antecedent debt is a conveyance supported by consideration. *See Evans v. Greenhow*, 56 Va. (15 Gratt.) 153, 156 (1859) ( "A pre-existing debt is, of itself, a valuable consideration for a deed of trust executed for its security . . . ."), *abrogated on other grounds by Boisseau v. Bass' Adm'r*, 100 Va. 207, 209-11 (1902), *and Dillard v. Collins*, 66 Va. (25 Gratt.) 343, 346-47 (1874); *see also Witz*, 83 Va. at 230 (same); Rendleman, *supra*, § 11.2[D], at 11-24 (3d ed. 2014) ("A debtor's antecedent debt to a transferee is fair consideration. An insolvent debtor may transfer to a bona fide creditor on account of an existing indebtedness.").

A court may find a conveyance fraudulent when an insolvent debtor retains indefinite, exclusive possession or de facto ownership of the conveyed assets, *see generally* 1 Moore, *supra* note 11, at 247-48; 2 *id.* at 517-27; Sinclair, *supra*, § 48-2[B], at 48-20 to -22, to such an extent that doing so effectively defeats the conveyance "in its entirety," *Mathews v. Bond*, 146 Va. 158, 164 (1926). The inference of fraud, however, cannot be drawn when debtor-in-possession provisions are features of a legitimate financial transaction. "The fact that the property [is] left in the possession of the grantor is of little import," we have explained, because when a debtor offers to "secure bona fide creditors, the fact that the grantor retains possession of the property

conveyed to the trustee does not of itself impute fraud to the transaction." *Id.* at 165. *See generally* 1 Glenn, *supra* note 11, § 305, at 533 (rev. ed. 1940 & Supp. 1950) ("If the donor or vendor of a chattel should remain in possession, without good excuse, this has been a 'badge of fraud' since the time of Coke.").[21]

An inference of fraud can also arise when an insolvent corporate debtor is under the "complete control" of one of its directors who is himself a stockholder and creditor of the corporation and the corporate debtor prefers that creditor-director. *See Darden*, 204 Va. at 111-13. *See generally* 15A Fletcher & Jones, *supra*, §§ 7428, 7467-69, 7480, at 211, 260-73, 291-92. This "complete control," however, must exist to such an extent that the corporate debtor and the creditor-director are "one and the same." *See Bank of Com. v. Rosemary & Thyme, Inc.*, 218 Va. 781, 787 (1978). Absent that unitary power of "complete control," which provides a basis to ascribe the debtor's transferred intent to the creditor-director, a director of a corporate debtor may in good faith direct the corporation to pay its debts to him in preference to other creditors. *See id.* at 785-88.[22]

---

[21] For this reason, we find unpersuasive Westwood's argument that G&K's retention of an interest in compensation for services rendered before the Buy-Out Date and in compensation for contingent-fee cases constitutes a badge of fraud, *see* Appellee's Br. (191413 & 191414) at 11 n.21. Those retained interests represent either work performed prior to the Buy-Out Agreement or contingent-fee compensation in representations that G&K secured, thereby justifying G&K in retaining such interests.

[22] Several commentators have criticized the line of cases that includes *Darden* and *Bank of Commerce* as confused or inconsistent. *See* Rendleman, *supra*, § 11.2[D], at 11-26 to -29 (3d ed. 2014 & Supp. 2020) (describing this line of cases as "considerably confused" and a "lamentable story"); Joseph E. Ulrich, *Creditors' Rights*, 22 U. Rich. L. Rev. 517, 526-29 (1988) (describing "the *Darden* rationale . . . as questionable on its face" and stating that "*Darden* has confused the law in this area"); Joseph E. Ulrich, *Fraudulent Conveyances and Preferences in Virginia*, 36 Wash. & Lee L. Rev. 51, 65-81 (1979) (describing the law in this area as "unsettled" and the cases as "in conflict" even though "each decision, when viewed in isolation, is arguably correct").

## IV. THE TRIAL COURT'S FRAUDULENT AND VOLUNTARY CONVEYANCE HOLDINGS

The trial court entered judgments against seven defendants, finding each jointly and severally liable for several "transfers" that it determined were fraudulent and voluntary. The court, however, did not "void" any of the allegedly unlawful conveyances. Nor did the court return any funds to K&A or to G&K/AMG for a ratable distribution to their competing creditors. The court instead entered in personam judgments against each of the seven defendants in favor of a single creditor. The appellants challenge the trial court's rulings on nearly every doctrinal ground. We agree that the judgments cannot be sustained on appeal, but we limit our holding to what we consider to be "the best and narrowest grounds available," *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (citation omitted).[23]

### A. The Burden of Proof

Many of the trial court's disputed decisions involve mixed questions of law and fact that require us to "afford deference to the trial court's factual findings" and to "review de novo its application of the law to the facts," *Ferguson v. Stokes*, 287 Va. 446, 450 (2014). When reviewing purely factual determinations, we ask whether they are "plainly wrong or without evidence to support [them]," Code § 8.01-680. How the governing legal standard applies to those presumptively correct facts, however, is a question of law entitled to no deference on appeal.

---

[23] Given our holdings regarding the fraudulent conveyance, voluntary conveyance, and conversion claims, we need not address the appellants' assertions that the trial court erred in various other ways, including by misapplying res judicata, failing to order a ratable distribution, miscalculating damages, failing to apply the statute of limitations, and erroneously awarding attorney fees and sanctions. *See* Appellants' Br. (Record Nos. 191413, 191414) at 36-50. Nor do we need to address any arguments specific to Coleman except those included within this opinion.

These established principles of appellate review often turn, as they do here, on which party had the burden of proof on the factual issues in contest. The burden of proof and the party that must bear it are purely legal questions. *Ballagh v. Fauber Enters., Inc.*, 290 Va. 120, 124 (2015). Under Virginia law, a party asserting a fraudulent conveyance claim must show "by 'clear, cogent and convincing' evidence" that the defendant made a conveyance within the meaning of Code § 55.1-400, meaning that he made it with the "inten[t] to delay, hinder or defraud his creditors," and that the party receiving the conveyance "had notice of the grantor's fraudulent intent." *La Bella Dona*, 294 Va. at 254 (citation omitted).

Our recent opinion in *White v. Llewellyn*, 299 Va. ___, 857 S.E.2d 388 (2021), clarified that in fraudulent conveyance cases the burden of persuasion shifts to the defendant if the claimant's prima facie proof includes a "badge of fraud" capable of satisfying the "clear, cogent, and convincing" standard when viewed in the context of the specific facts of the case. *See* 299 Va. at ___, 857 S.E.2d at 390-94.[24] In the present case, however, the trial court and the parties litigated the case under the burden-of-proof scheme that we rejected in *White*. The parties agree that the burden of persuasion remained with Westwood once the defendants had satisfied their burden of production to present prima facie evidence that could rebut the asserted badges of fraud.[25]

---

[24] "Badges of fraud do not, of themselves, decide issues," Professor Rendleman has rightly explained, because they merely "realign the burdens of presentation and proof." Rendleman, *supra*, § 11.2[C][1], at 11-11. *See generally* Bigelow, *supra*, at 526-27 ("But all these minor badges of fraud, that is, all badges insufficient to create a presumption, are upon a sliding scale of values, for better or worse according to their own nature and according to the influence of accompanying facts."); Bump & Gray, *supra* note 13, §§ 43-44, at 31-32 ("All badges of fraud are not, however, entitled to equal weight as evidence. . . . The books accordingly speak of strong badges and slight badges of fraud, meaning by the word 'badge' nothing more than that the fact relied on has a tendency to show fraud, but leaving its greater or less effect to depend on its intrinsic character.").

[25] *See* Appellants' Br. (Record Nos. 191413, 191414) at 38-40; Appellee's Br. (Record Nos. 191413, 191414) at 38-39 & n.49; Reply Br. (Record Nos. 191413, 191414) at 12-13 n.25.

On appeal, Westwood reaffirms its understanding of the applicable burden of proof. On brief, Westwood contends that the trial court correctly applied the burden of proof because the "court emphasized that only the *burden of producing evidence* (not the burden of persuasion) shifts to the Defendants." Appellee's Br. (Record Nos. 191413, 191414) at 38 & n.49 (emphasis in original).[26] Westwood's counsel, in oral argument before us, doubled down on this point, stating repeatedly that only the burden of production shifts and that the burden of persuasion does not — with the ultimate burden of persuasion remaining on the claimant. *See* Oral Argument Audio (Record Nos. 191413, 191414) at 30:35 to 32:50. At no point before the trial court[27] or before us have either of the parties asserted that the burden of persuasion shifts to the defendants in a fraudulent or voluntary conveyance case after the claimant has proven a badge of fraud.

For these reasons, we will review the evidence and the trial court's findings pursuant to the burden-of-proof scheme agreed to by the parties and adopted by the trial court. We will not ex post facto change on appeal the burden of proof applied in a civil case when no party asks us to do so and when the trial court adopted it as the governing standard with both parties' apparent agreement. This situation is the bench-trial equivalent of a civil case tried to a jury on burden-of-

---

[26] A "burden of production" requires a party merely "to come forward with evidence to make a prima facie case." *SunTrust Bank v. PS Bus. Parks, L.P.*, 292 Va. 644, 652 (2016) (citation omitted); *see also White*, 299 Va. at ___, 857 S.E.2d at 391. The prima facie showing need not actually persuade the factfinder. It need only be capable logically and legally of doing so. *See* Kent Sinclair & Charles E. Friend, The Law of Evidence in Virginia §§ 4-8, 5-1[a]-[b], at 240, 314-15 (8th ed. 2018). The "burden of persuasion" imposes "the obligation to introduce evidence that actually persuades the fact finder to the requisite degree of belief that a particular proposition of fact is true" and "is sometimes referred to as the 'risk of non-persuasion,' because the party that bears the burden of persuasion must lose the case if the evidence leaves the factfinder in doubt." *SunTrust Bank*, 292 Va. at 652-53 (citations omitted).

[27] In the trial court, the appellants stated that "[t]he Plaintiff's burden of production *and* its burden of persuasion are by 'clear, cogent and convincing evidence'" and that "[a]lthough the burden of production may shift, the burden of persuasion does not." 4 J.A. at 1598 (emphasis in original) (citation omitted).

proof jury instructions that the successful party does not challenge on appeal. *See, e.g.*, *Landmark Commc'ns, Inc. v. Macione*, 230 Va. 137, 140 (1985).

## B.  The Challenged Conveyances

Westwood's fraudulent and voluntary conveyance claims presuppose that the various conveyances by Westwood's debtors, G&K/AMG and K&A, to Grayson and his related entities were made without legal consideration or were, for some other reason, in violation of Westwood's superior claims.  On each of the contested issues in this case, the appellants presented sufficient prima facie rebuttal evidence that left Westwood (pursuant to the parties' agreed-upon burden-shifting scheme) with the ultimate burden of persuasion.  As a consequence, Westwood had the ultimate burden of persuasion to prove its allegations by clear, cogent, and convincing evidence.  On several foundational issues, the trial court erred by concluding that Westwood had shouldered its burden of persuasion.

We first address the Buy-Out Agreement (in which K&A bought the assets and assumed the liabilities of G&K/AMG) and the GSA Loan Agreement (pursuant to which GSA, through G&K/AMG, lent money to K&A and pursuant to which GSA obtained a confessed judgment when the loans went unpaid).  The trial court held that "[t]he Buy-Out Agreement and the GSA Loan Agreement lacked mutuality and consideration ab initio, [and] were thus not originally enforceable."  1 J.A. at 93.  We find no legal or factual basis for this conclusion.

By its own terms, the Buy-Out Agreement (and related K&A Security Agreement) reflects a bargained-for exchange with extensive bilateral consideration.  In return for K&A promising to pay a $2 million purchase price, to assume approximately $2.8 million in debt to Grayson, and to lend various items and services to G&K/AMG in its efforts to wind up its business, G&K/AMG turned over all of its assets, clients, and resources to K&A.  *See supra* pp. 3-5.  G&K/AMG obtained a security interest in its portion of the consideration, and the

30

conveyance ultimately amounted to an acquisition of debt by K&A. By virtue of the Buy-Out Agreement and attendant K&A Security Agreement, K&A became a debtor to G&K/AMG and to Grayson, who had perfected security interests in the debt.

The GSA Loan Agreement also reflected adequate consideration. In exchange for loaned funds, K&A granted GSA a lien on all of K&A's assets and the right to confess judgment against K&A, and the agreement granted this lien and power of attorney regardless of which entity GSA caused to loan the funds to K&A. The loan agreement provided for interest, and GSA intended to make a profit on this business debt. *See supra* p. 8. In sum, there is no clear, cogent, and convincing evidence proving that the Buy-Out Agreement and GSA Loan Agreement were fraudulent shams meant to mask wholly nonexistent transactions or that the debt that K&A had expressly assumed was a pure fiction.

To be sure, the trial court treated the underlying debts as valid and subsisting for purposes of determining that K&A had been insolvent. The trial court could not, without committing legal error, find the debts to be valid and subsisting for purposes of determining that K&A was insolvent (and thus that its conveyances were fraudulent and voluntary) and at the same time find them to be entirely fictional for purposes of determining whether there was consideration to support these instruments. *See, e.g.*, *Hines v. Commonwealth*, 292 Va. 674, 680 (2016) (observing that the trial court's statements in its conclusions of law were "inconsistent with [its] own findings of fact and are not supported by the record"); *Forbes v. Schaefer*, 226 Va. 391, 400 (1983) ("This latter holding is not compatible with the former, nor is it supported by the evidence or the applicable law.").[28]

---

[28] Westwood argues that "[t]he trial court properly found the security agreements to be 'unsupported by adequate consideration and/or made to entities unentitled to receive the same.'" Appellee's Br. (Record Nos. 191413, 191414) at 25 (alteration and emphasis omitted) (quoting 1 J.A. at 93). However, the finding that Westwood quotes was in relation to "the relevant

31

Equally problematic, the trial court agreed that "it is inferable that Grayson did *not* set out to defraud creditors" and only hoped to "hedge his bets as to the viability of the new entity, and place the risk of failure onto the shoulders of creditors if he so chose." 1 J.A. at 90 (emphasis added). Addressing the same factual issue in the context of attorney fees, the court stated that Grayson had *no* "intent to, you know, create a fraudulent scheme where he wouldn't pay the landlord at all because there were payments made." 3 *id.* at 1008. In declining to revisit a pretrial ruling, the court added that it was "of the view . . . that the Defendants did not act with 'actual malice,' i.e., 'ill-will, hatred, or spite directed toward the Plaintiff'" but instead "under the mistaken belief various transactions were supported by adequate consideration and that their agreements would not be found to lack mutuality, to them an unforeseen eventuality." 1 *id.* at 123 (alteration and citation omitted).

On these issues, Westwood did not carry its agreed-upon burden of persuasion, which required it to prove "by 'clear, cogent and convincing' evidence" that the Buy-Out Agreement and GSA Loan Agreement (along with the debts created and assumed by both) lacked legal consideration and thus were sham instruments meant to "delay, hinder or defraud . . . creditors," *La Bella Dona*, 294 Va. at 254 (citation omitted). With these foundational issues settled, we now address the five transfers that the trial court held to be fraudulent and voluntary conveyances.

---

individual transfer transactions," 1 J.A. at 93, and the court's analysis of these individual transfers did not treat the security agreements as separate transfers or find them fraudulent or voluntary in and of themselves, *see id.* at 98-105, 107-10. As detailed throughout this opinion, both security agreements were supported by adequate consideration, and there was sufficient evidence to overcome any other potential badge of fraud pertaining to the security agreements (i.e., insolvency, relationship, threatened litigation, backdating, and the lack of a signature on related documents) that Westwood alleges, *see* Appellee's Br. (Record Nos. 191413, 191414) at 25.

Westwood also asserts that Grayson's Financial Disclosure Statement to Congress does not reflect the Grayson Debt. *See id.* at 9. The disclosure statement, however, explicitly instructed Grayson to exclude "liabilities of a business in which you own an interest (unless you are personally liable)." 4 J.A. at 1415.

32

### 1. The GSA Loan and Confessed Judgment

The first transfer that the trial court found to be fraudulent and voluntary was the GSA Loan Agreement that resulted in the confessed judgment against K&A. The trial court did not address how the loan agreement or the confessed judgment qualified as an actionable conveyance under the fraudulent and voluntary conveyance statutes.[29] The trial court instead focused on its findings that none of the funds had come from GSA itself and that the transfers had been "cloaked with multiple badges of fraud" because they had been "made among closely related parties, lacked adequate consideration, were made when both G&K/AMG and K&A were insolvent, and at a time both entities were being pursued by [Westwood]." *See* 1 J.A. at 99-100. This analysis is incorrect both factually and legally.

The GSA Loan Agreement specifically states that GSA can cause other entities, including G&K/AMG, to issue the funds to K&A. *See* 3 *id.* at 1066. The fact that GSA did not directly provide the loan funds itself is irrelevant. As consideration, the loan provides for interest, for a lien on K&A's assets (including its receivables), and for the appointment of Gene Brown as attorney-in-fact to confess judgment against K&A. *See id.* at 1066-67. Further demonstrating consideration, the GSA Loan Agreement specifically states that "GSA's purpose in entering into this arrangement is to make a profit. Money lent under this agreement shall be deemed a business debt. It is created in connection with GSA's trade or business." *Id.* at 1066.[30]

---

[29] In exchange for its loans to K&A, GSA received a lien and a monetary judgment. Our review of the record does not show that GSA was ever able to convert these inchoate rights into an actual monetary recovery. If no recovery was ever had or could be had, we question whether K&A conveyed anything of value in order to render the fraudulent and voluntary conveyance statutes applicable.

[30] We disagree that the record supports the trial court's statement that G&K/AMG and K&A "were being pursued," 1 *id.* at 100, in January or December 2009, the effective dates of the GSA Loan Agreement and of the confessed judgment, respectively. At trial, Westwood's property manager stated that K&A had begun to default on the lease in the summer of 2009. *See id.* at 361. Contrary to the property manager's testimony, Westwood's complaint alleges that the

The trial court misapplied the governing legal principles by anchoring its conclusion so heavily to the relationship between Grayson and his entities. As a general rule,

> [r]elationship is not a badge of fraud. There is no law which forbids persons standing in near relations of consanguinity, affinity, or business from dealing with each other, or which requires them to conduct their business with each other differently from the manner in which they conduct it with other persons.

*Johnson*, 103 Va. at 40-41.

> The relationship of the parties does not, of and in itself, cast suspicion upon the transaction, or create such a prima facie presumption against its validity as would require the court to hold it to be invalid without proof that there was fraud on the part of the grantor, participated in by the grantee. This proposition is so well settled that authorities need not be cited in its support.

*Gottlieb v. Thatcher*, 151 U.S. 271, 279 (1894). A close relationship is merely something to be "closely scrutinized." *See Johnson*, 103 Va. at 40-41.

Close scrutiny does not justify the imposition of fraudulent or voluntary conveyance liability for the GSA Loan Agreement and confessed judgment. Even if both G&K/AMG and K&A were insolvent at the time of the alleged transfers, "we need not cite authority to show that in this state it is lawful for a debtor, *though insolvent*, to prefer certain of his creditors . . . and that such preference is neither fraudulent per se nor a badge of fraud," *cf. Breeden v. Peale*, 106 Va. 39, 43-44 (1906) (emphasis added). *See Johnson*, 103 Va. at 38 (stating that "[g]iving such a preference is not fraudulent, though the debtor be insolvent and the creditor is aware at the time that it will have the effect of defeating the collection of other debts").[31] Contrary to the trial

---

first lease default was "as early as December, 2009," which the complaint labels the "Claim Date." *See id.* at 7. Moreover, the only notices of default in the record begin in January 2010, *see* 3 *id.* at 1154-78, and Westwood's counsel stated at trial that the first default had occurred in December 2009, *see* R. at 1141.

[31] *See also, e.g.*, *Bank of Pocahontas v. Ferimer*, 161 Va. 37, 42 (1933) ("Insolvency of the maker of a deed and his blood relationship to the grantee or beneficiary in a deed of trust are not sufficient to establish fraud in the conveyance and justify a court in setting it aside. The

court's conclusion, the GSA Loan Agreement and the confessed judgment were simply the payment of a bona fide, preexisting debt and did not constitute a fraudulent or voluntary conveyance.

## 2. The 2011 G&K/AMG Checking-Account Payments

The second set of transfers, totaling approximately $42,000, that the trial court found to be both fraudulent and voluntary was the transfers from G&K/AMG to GLC, GCI, and Grayson. The court again stated, as it had regarding the GSA Loan Agreement and confessed judgment, that the "transfers were cloaked with multiple badges of fraud: they were made among closely related parties, lacked adequate consideration, were made when both G&K[/AMG] and K&A were insolvent, and at a time both entities were being pursued by [Westwood]." 1 J.A. at 100.

The badges of fraud that the court relied upon to find these transfers fraudulent and voluntary do not apply here. As stated previously, relationship is not by itself a badge of fraud. *See supra* p. 34. The transfers at issue occurred in 2011, after Westwood had begun to send notices of default, and some after Westwood had filed the first action to collect back rent from K&A. Grayson, a perfected, secured creditor of G&K/AMG, directed the payments to reduce

---

mere fact that a debtor has seen fit to prefer one creditor over another is not any ground for setting aside a conveyance."); *Shoemaker v. Chapman Drug. Co.*, 112 Va. 612, 614 (1911) ("Conceding the relationship of the parties and the insolvency of the grantor, these conditions do not of themselves constitute badges of fraud, and relieve the creditors from the burden of proving the charges of fraud set forth in their pleadings."); Bump & Gray, *supra* note 13, § 179, at 204-05 ("The statute does not deprive a man of the power to sell or otherwise dispose of his property, although he may be insolvent, and the mere fact that the transfer may tend to delay or hinder his creditors will not alone render it fraudulent. . . . Mere insolvency alone does not vitiate any transfer. In addition to the indebtedness there must be an intent on the part of the debtor to delay, hinder or defraud his creditors." (footnote omitted)).

In some circumstances, insolvency can render a voluntary conveyance voidable under Code § 55.1-401, but only if the conveyance was made "without consideration deemed valuable in law." *See Hudson v. Hudson*, 249 Va. 335, 340 (1995) (interpreting former Code § 55-81); *see also* Virginia Code Comm'n, *Report on Revision of Title 55 of the Code of Virginia*, S. Doc. No. 5, at 52 (2018) (stating that the 2019 recodification made "[t]echnical changes" only).

G&K/AMG's preexisting debt to him personally, to provide a loan to GLC, and to close down the G&K/AMG account. *See supra* p. 10-11. In short, the payments were made for adequate consideration in payment of an antecedent debt to a creditor with a perfected security interest.[32]

We thus hold that Westwood did not prove by clear, cogent, and convincing evidence that the 2011 G&K/AMG checking-account payments were fraudulent or voluntary conveyances under Virginia law.

### 3. The *Halldorson* Settlement Proceeds

The third transaction that the trial court found to be fraudulent and voluntary was the transfer of the *Halldorson* settlement proceeds from the *Halldorson* defendants through Gene Brown to GLC and ultimately to Grayson. The trial court did not directly address the question whether the transfer of money by the *Halldorson* defendants to GLC and Grayson (neither of whom were debtors to Westwood) constituted an unlawful conveyance of funds by K&A or G&K/AMG (both of which were debtors to Westwood). Instead, the court stated that these transfers "were cloaked with multiple badges of fraud: they were made among closely related parties, lacked adequate consideration, were made when K&A was insolvent, and when it was being pursued by [Westwood]." 1 J.A. at 101. The court also found that, "[o]f this sum, Grayson testified $100,000 was transferred to Kubli, personally" and that "Coleman was . . . more than a mere conduit" in this transfer. *See id.* at 82-83, 100. Coleman had not been a "mere conduit" because, for example, she had sent an email in which she had stated that the back rent

---

[32] Because preference payments to bona fide creditors are legally permissible, *see supra* pp. 22-26, we need not address G&K/AMG's and Grayson's argument that their perfected security interests were superior to that of Westwood's judicial lien. *See* Code § 8.9A-317(a) (stating that a security interest is subordinate to the rights of a lien creditor who becomes a lien creditor *before* the security interest is perfected); Code §§ 8.9A-308(a), -310 (describing the requirements for perfection of a security interest, including attachment and filing); Code § 8.9A-203 (stating when a security interest attaches).

owed to Westwood would be paid, but "[a]pproximately nineteen separate events ensued, . . . which were in derogation of [her] representations and which served to delay and hinder enforcement action by [Westwood]." *See id.* at 100-01.

On this subject, the trial court erred both factually and legally. Grayson never testified that Kubli had personally received $100,000 from the *Halldorson* settlement. Instead, he testified that, as a result of "discussions between [him] and [Kubli]," and as "a matter of making an internal [allocation] between" K&A, Grayson on behalf of G&K/AMG (since Grayson had taken back all of G&K/AMG's assets), and GLC, K&A had "kept $100,000, $30,000 of which ended up in the landlord's pocket," and that he had, "either as in the shoes of [G&K/AMG], or alternatively as the prior [GLC]," directed the "payment to come — not to [K&A], but to [himself]." 2 *id.* at 704. In other words, the $100,000 never went to Kubli personally, but was allocated to K&A for work performed on the *Halldorson* case. Kubli, it must be remembered, did not personally guarantee the Westwood lease and was not himself a debtor of Westwood.

Westwood received approximately $30,000 of the *Halldorson* settlement proceeds in garnishment funds, and the rest of the proceeds, which were due either to G&K/AMG or to GLC, went to Grayson on account of his work at GLC on the *Halldorson* case or on account of his taking back of G&K/AMG's assets under the G&K/AMG Security Agreement. The trial court erred by concluding that the conveyance of the *Halldorson* settlement proceeds had "lacked adequate consideration," 1 *id.* at 101. At the time, K&A was in debt to G&K/AMG for millions of dollars pursuant to the Buy-Out Agreement, and G&K/AMG, in turn, owed Grayson several million dollars. The Grayson Debt was perfected and secured by the G&K/AMG Security Agreement, which G&K/AMG had executed in favor of Grayson for all of G&K/AMG's assets. Grayson was ultimately entitled to the proceeds, and the fact that he directed his attorney to pay the proceeds to GLC is irrelevant. Any alleged transfer from K&A of settlement proceeds due to

37

it from the *Halldorson* defendants to G&K/AMG and then to GLC at Grayson's direction was in payment of a valid, secured, preexisting debt and thus was made in exchange for valuable consideration.

The trial court's only specific finding regarding Coleman's alleged involvement in this transaction was that Coleman had sent an email to the property manager expressing her belief that K&A would pay the back rent soon because it anticipated receiving the *Halldorson* settlement proceeds. None of the 18 events following the email that the trial court references involved Coleman specifically. *See* R. at 1088-90. The court, therefore, plainly erred by finding that Kubli and Coleman had personally received the *Halldorson* settlement proceeds or participated in this conveyance.

### 4. The IDT Legal Fees

Next, the trial court found that the payments from IDT to GLC between May 2011 and September 2012 "were really due" to G&K/AMG, discrediting Grayson's and Coleman's directly contrary testimony. *See* 1 J.A. at 101-02. In other words, the funds solely belonged to G&K/AMG, and G&K/AMG was unlawfully diverting its assets to GLC. The trial court relied upon Coleman's previous statement that the funds had been paid for work done before 2009 and upon the lack of a written agreement memorializing any alleged new retainer agreement between Grayson and IDT in 2011. *See id.* It then found that similar badges of fraud to those that had applied to the other transfers had "cloaked" these IDT payments, including a close relationship, the absence of adequate consideration, insolvency, and pursuit by Westwood. *See id.* at 102. The trial court erred in coming to this conclusion.

Westwood's original complaint never alleged that the IDT payments to GLC had been fraudulent or voluntary conveyances. That complaint only mentioned "the 'IDT' cases" in a description of assets transferred pursuant to the Buy-Out Agreement. *See id.* at 6. Westwood

38

later filed an amended complaint solely against Coleman. *See id.* at 20. The amended complaint asserted that Coleman was personally liable because she "diverted" the IDT payments to GLC. *See id.* at 30-31.

The appellants made the trial court aware of this pleading issue both during closing arguments and in their post-trial briefs. *See* 4 *id.* at 1589 n.6; 5 *id.* at 1991 n.10, 1992, 2107, 2141 n.3, 2144 n.8, 2169, 2183; R. at 3931-32, 4021, 4713. The court did not address the issue in its letter opinion, which imposed liability on all of the appellants, including Coleman. As we have stated many times,

> The basis of every right of recovery under our system of jurisprudence is a pleading setting forth facts warranting the granting of the relief sought. It is the sine qua non of every judgment or decree. No court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed. Pleadings are as essential as proof, the one being unavailing without the other. A decree cannot be entered in the absence of pleadings upon which to found the same, and if so entered it is void. Every litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense. The issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence.

*Allison v. Brown*, 293 Va. 617, 626 (2017) (alterations and citation omitted).

"It is well settled that when fraud is relied upon to set aside a conveyance it must be expressly charged," *Colonial Inv. Co. v. Cherrydale Cement Block Co.*, 194 Va. 454, 459 (1952); *see also McClintock v. Royall*, 173 Va. 408, 415 (1939), and "clearly alleged," *Temple v. Jones, Son & Co.*, 179 Va. 286, 297 (1942), in order "to accommodate the [pleading] requirement that clear and convincing evidence requires," Sinclair, *supra*, § 19-1[C], at 19-5 to -6 (5th ed. 2016 & Supp. 2020). As a result, the trial court erred by imposing liability for the IDT funds on the

appellants, who were not alleged in the complaints to be liable for diverting the IDT funds to GLC or to anyone else.[33]

The trial court also erred by imposing liability for the IDT payments on Coleman under fraudulent and voluntary conveyance principles. Coleman was a bookkeeper working for GLC at the time of the IDT payments. She was not a debtor of Westwood attempting to place the IDT funds out of the reach of her creditors. Nor was she a transferee pocketing the money for herself. As noted earlier, the fraudulent and voluntary conveyance statutes apply to debtors who convey (within the broad meaning of the statutes) and to those who receive from the conveyance. *See supra* at 17-19. A fraudulent conveyance claim "is not a predicate unlawful act from which liability can be spread to others on a theory of civil conspiracy." *La Bella Dona*, 294 Va. at 257. The power to impose an in personam judgment generally applies against "recipients of fraudulent cash transfers" but not against "other participants or coconspirators" in the fraudulent scheme. *Id.* at 256.

For these reasons, we find no legal or factual basis for the trial court's joint and several, in personam judgments against Coleman, or any other defendants, based upon the IDT payments.

### 5. The Asset Take-Back and Debt Write-Off

The trial court found that the K&A asset take-back and debt write-off noted on K&A's amended 2011 tax return had been "cloaked" with the same badges of fraud as the other transfers. *See* 1 J.A. at 103. However, the court found that the voluntary and fraudulent conveyance statutes did not reach this transfer because "the original loan agreement creating the 'debt' was void, and as such therefore, there is arguably no valid debt to transfer by means of

---

[33] Given our ruling, we need not address the appellants' argument that Grayson, as a secured, perfected creditor of G&K/AMG, which in turn was a secured, perfected creditor of K&A, had the right to direct any funds owed to K&A to GLC.

forgiveness." *Id.* at 104. Even so, "[t]o the extent the 'loans' [were] not void, the [c]ourt conversely [found] that, in such event, the transfers made in contemplation of claimed repayment thereof were unlawful conveyances in derogation of the rights of [Westwood] as already detailed." *Id.*

Because we find the Buy-Out Agreement and GSA Loan Agreement to be supported by valuable consideration, we must address the trial court's alternative finding that the asset take-back and debt write-off was nonetheless fraudulent and voluntary because "Grayson unilaterally forgave all claimed indebtedness of K&A to the Grayson entities," *id.* at 102. Because the loans to K&A had been written off as bad debt, the court stressed, in association with Grayson taking back all of K&A's assets, Grayson must have forgiven any debt incurred by K&A from the Buy-Out Agreement and GSA Loan Agreement *See id.* at 103. At trial, Grayson and Kubli testified that Grayson had never forgiven K&A's debt. The trial court rejected this testimony and erred in doing so.

We have often said that "although a fact-finder must determine the weight and credibility of witnesses, it may not *arbitrarily* disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with the facts in the record, even though such witnesses are interested in the outcome of the case." *Breckenridge v. Marval Poultry Co.*, 228 Va. 191, 195 (1984) (collecting cases) (emphasis added). The "arbitrarily" adverb in this rule is crucial because it makes clear that the rule does not categorically forbid a factfinder from disregarding what may appear to be uncontradicted evidence. The rule only forbids courts from *arbitrarily* disregarding such evidence. A witness cannot make an obviously self-serving statement and expect the factfinder to be bound to believe it so long as no evidence directly refutes it. In some cases, it might be quite reasonable to disregard such a statement.

41

An uncontradicted statement is "inherently incredible," and thus may be disregarded, *see Cheatham v. Gregory*, 227 Va. 1, 4-5 (1984) (per curiam), when it is "'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ,'" *Gerald v. Commonwealth*, 295 Va. 469, 486-87 (2018) (citations omitted).  A court can also disregard an uncontradicted statement that is flatly "inconsistent with the facts in the record," *Breckenridge*, 228 Va. at 195, or when the background facts expressly or implicitly diminish the believability of the statement. What makes a factfinder's disregard of uncontradicted testimony arbitrary, therefore, is its palpable unreasonableness when considered in light of the totality of the evidence.

In this case, we hold that the trial court arbitrarily disregarded Grayson's and Kubli's testimony concerning whether Grayson had forgiven K&A's debt.  Their testimony was not inherently incredible and was consistent with lawful commercial practices.  As one commentator has observed, "in banking parlance, a 'charge-off' associated with a Form 1099-C is merely an accounting entry that does not affect the legal obligation to pay the debt or evidence an intent to discharge the debt."  4 William D. Hawkland et al., Uniform Commercial Code Series § 3-604:1 n.1, at Art. 3-1,079 (2020).  Put another way,

> A write-off is simply an internal recognition by a lender that an account is worthless after attempts at collection have failed. . . .  "When a lending institution 'writes off' a 'bad debt,' it is merely indicating that the debt is uncollectible.  That is, it is no longer an asset of the institution.  A 'write off' does not mean that the institution has forgiven the debt or that the debt is not still owing."

*Ally Fin. Inc. v. State Treasurer*, 918 N.W.2d 662, 675 (Mich. 2018) (quoting *Mitchell Bank v. Schanke*, 676 N.W.2d 849, 854 n.7 (Wis. 2004)).

This principle applies to federal tax forms that report an accounting write-off of an uncollected debt.  Surveying this subject in great detail, the United States Court of Appeals for

42

the Fourth Circuit has held that "filing a Form 1099-C . . . is not a means of accomplishing an actual discharge of debt" in part because the IRS "treats the Form 1099-C as a means for satisfying a reporting obligation and not as an instrument effectuating a discharge of debt or preventing a creditor from seeking payment on a debt." *See FDIC v. Cashion*, 720 F.3d 169, 178-80 (4th Cir. 2013). Rejecting the view of the "small minority" of courts suggesting otherwise, *id.* at 178, the Fourth Circuit affirmed the district court's holding that "'a Form 1099-C does not itself operate to legally discharge a debtor's liability,' and thus 'does not, standing alone, raise a genuine issue of material fact regarding [the debtor's continuing] liability on the Note,'" *id.* at 177 (citation omitted).[34] For this reason, the trial court erred in finding, in the alternative, that this challenged transfer was fraudulent and voluntary.

## V. THE CONVERSION CLAIM AGAINST GRAYSON

Independent of its fraudulent and voluntary conveyance holdings, the trial court also erred in imposing liability on Grayson for the tort of conversion relating to the *Halldorson* settlement proceeds. We recently explained the general principles governing conversion claims.

> Conversion is "any wrongful exercise or assumption of authority over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." Although a cause of action for conversion typically applies only to tangible property, this Court has recognized the conversion of intangible property rights that "arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." To establish a conversion of intangibles, however, the plaintiff must have both a property interest in and "be entitled to immediate possession" of the documented intangible property. For this reason, this Court has refused to recognize a conversion claim "for interference with

---

[34] *See also Ware v. Bank of Am. Corp.*, 9 F. Supp. 3d 1329, 1340-41 (N.D. Ga. 2014); *In re: Washington*, 581 B.R. 150, 156-59 (Bankr. D.S.C. 2017); *Bononi v. Bayer Emps. Fed. Credit Union*, 407 B.R. 684, 688-91 (Bankr. W.D. Pa. 2009); *Leonard v. Old Nat'l Bank Corp.*, 837 N.E.2d 543, 545-46 (Ind. Ct. App. 2005); *Lifestyles of Jasper, Inc. v. Gremore*, 299 S.W.3d 275, 277 (Ky. Ct. App. 2009); *Flathead Bank of Bigfork v. Masonry by Muller, Inc.*, 383 P.3d 215, 217-19 (Mont. 2016).

> *undocumented* intangible property rights."  Only "a clear, definite,
> undisputed, and obvious property right in a thing to which the
> plaintiffs are entitled to immediate possession is sufficient to
> support a claim for conversion."

*Mackey v. McDannald*, 298 Va. 645, 659-60 (2020) (alterations and citations omitted) (emphasis

in original).  The tort of conversion can also apply to money, including settlement proceeds

wrongfully withheld.  *See PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 344 (2003).  *See*

*generally* Sinclair, *supra*, § 12-1, at 12-4 to -5.

We need not decide whether the tort of conversion lies for the alleged diversion of the

*Halldorson* settlement proceeds, *see generally* 3 Dan B. Dobbs et al., The Law of Torts § 711, at

804-08 (2d ed. 2011 & Supp. 2020), because Westwood did not have an immediate right to

possession of these proceeds, much less one that was "clear, definite, undisputed, and obvious,"

*Mackey*, 298 Va. at 659-60 (citation omitted).  Those proceeds were subject to a valid,

preexisting, and superior security interest in favor of G&K/AMG, and ultimately in favor of

Grayson.  *See generally* 1 Dobbs et al., *supra*, § 61, at 170-71 (2d ed. 2011) (stating that in many

cases, the issue of conversion depends upon whether the defendant or plaintiff has a superior

property interest); *id.* § 66, at 184 ("The defendant's mere assertion of a lien or security interest

against the plaintiff's property is not necessarily a conversion of the property even though the

defendant has no right to a lien on it.").[35]

The Uniform Commercial Code specifically allowed Grayson to claim the funds pursuant

to his perfected security interest.  "If so agreed, and in any event after default, a secured party"

---

[35] As one commentator has correctly observed:  "The exercise by the alleged converter of
a legal right, such as the right of execution on a judgment or an act in accord with a contractual
right, cannot form the basis for an action for conversion."  Francis H. Casola, *Conversion in*
Virginia Lawyers Practice Handbook: Virginia Business Torts § 4.203, at 175 (Edward B. Lowry
et al. eds., 4th ed. 2019).

may, among other things, "notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party" or

> enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

Code § 8.9A-607(a)(1), (3).

We also find no merit in Westwood's argument, which the trial court adopted, that the issuance of a fieri facias writ abrogated Grayson's UCC remedies. "The writ of fieri facias may be levied as well on the current money and bank notes, as on the goods and chattels of the judgment debtor . . . and shall bind what is capable of being levied on only from the time it is actually levied by the officer . . . ." Code § 8.01-478.

> Every writ of fieri facias shall, in addition to the lien it has under §§ 8.01-478 and 8.01-479 on what is capable of being levied on under those sections, be a lien from the time it is delivered to a sheriff or other officer, or any person authorized to serve process pursuant to § 8.01-293, to be executed, on all the personal estate of or to which the judgment debtor is, or may afterwards and on or before the return day of such writ or before the return day of any wage garnishment to enforce the same, become, possessed or entitled, in which, from its nature is not capable of being levied on under such sections, . . . *except that, as against an assignee of any such estate for valuable consideration, the lien by virtue of this section shall not affect him unless he had notice thereof at the time of the assignment*.

Code § 8.01-501 (emphasis added).

G&K/AMG and Grayson were assignees for valuable consideration as the *Halldorson* settlement proceeds were assigned in satisfaction of an antecedent debt, excluding them from the lien of Code § 8.01-501. *See Virginia Mach. & Well Co. v. Hungerford Coal Co.*, 182 Va. 550, 559 (1944) (stating that a predecessor statute expressly exempted from the fi fa lien property

45

assigned for valuable consideration without notice); *Evans*, 56 Va. (15 Gratt.) at 160-62 (describing this exception to the lien under a predecessor statute); *cf. Cygnus Newport-Phase 1B, LLC v. City of Portsmouth*, 292 Va. 573, 587 (2016) (describing "the shelter doctrine"); *Bowman v. Holland*, 116 Va. 805, 810 (1914) (stating that a bona fide purchaser with no notice will obtain good title from a purchaser who has notice).[36]

In the K&A Security Agreement, K&A assigned all of its receivables to G&K/AMG as security for K&A's performance of the Buy-Out Agreement. G&K/AMG thereafter assigned its rights to these receivables to Grayson in the G&K/AMG Security Agreement. Both assignments were for valuable consideration and in payment of an antecedent debt. The security agreements and UCC financing statements had been executed before the garnishment summons was delivered into the hands of the sheriff on May 31, 2011. G&K/AMG was an assignee of the *Halldorson* proceeds for value and without notice, and the lien of the writ of fieri facias did not attach to the proceeds as against G&K/AMG. *See* Code § 8.01-501. The lien could not have re-attached when Grayson acquired the proceeds based upon the further assignment of G&K/AMG's assets to him. The trial court erred in finding Grayson liable for conversion.

## VI. CONCLUSION

We agree with the appellants that the trial court's in personam, joint and several judgments in this case must be reversed as legally erroneous and factually insupportable. We vacate the court's final judgments in favor of Westwood and enter final judgments in favor of the appellants.

*Reversed, vacated, and final judgment.*

---

[36] *See generally* Rendleman, *supra*, § 3.2[D], at 3-18, -20 (stating that "when the property is intangible, an assignee without notice from the debtor who pays valuable consideration will defeat the judgment creditor's lien" and that "[t]he lien does not attach . . . to exempt property or property subject to an assignment when the assignee for valuable consideration takes without notice").